**Gino A. SPECA and Vera Speca,
Appellants,**

**v.**

**COMMISSIONER OF INTERNAL
REVENUE, Appellee.**

**Joseph F. MADRIGRANO and Shirley
M. Madrigrano, Appellants,**

**v.**

**COMMISSIONER OF INTERNAL
REVENUE, Appellee.**

**Nos. 79–2191, 79–2192.**

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1980.

Decided Sept. 24, 1980.

Stanley Gimbel, Milwaukee, Wis., for appellants.

Thomas M. Preston, Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before BAUER, Circuit Judge, CUDAHY, Circuit Judge, and NOLAND, District Judge.*

---

\* District Judge James E. Noland of the Southern District of Indiana is sitting by designation.

NOLAND, District Judge.

This is an appeal from a finding by the Tax Court of a deficiency in income taxes by appellants Gino A. Speca and Joseph F. Madrigrano for the year 1971.[1] The sole issue for review is whether the Tax Court erred in holding that certain transfers of stock by appellants to their children lacked sufficient economic reality to permit income from the stock to be taxed to the transferee–children rather than the transferor–parents. A review of the record reveals the following undisputed facts.

Appellants are executives of Triangle Wholesale Company, Inc. (Triangle), a beer wholesaler and distributor operating in Wisconsin. Since 1969, Triangle has operated as a Subchapter S corporation. As of 1968, stock ownership in Triangle was completely within the Speca and Madrigrano families in the following amounts and percentages:

| Name | Shares | Percentages |
|---|---|---|
| Joseph Madrigrano (Sr.) | 376 | 18 |
| Joseph Madrigrano (Jr.) | 170 | 8 |
| Glenn Madrigrano | 170 | 8 |
| Mary Madrigrano | 170 | 8 |
| Karen Madrigrano | 170 | 8 |
| Gino Speca | 376 | 18 |
| Armand Speca | 170 | 8 |
| Rosalyn Speca | 170 | 8 |
| Gene Speca | 170 | 8 |
| Peter Speca | 170 | 8 |

At all times relevant to these proceedings, Madrigrano was president, secretary, and a director of Triangle. Speca was also a director of Triangle in addition to serving in the capacity of vice–president and treasurer. Both Madrigrano and Speca received salaries of approximately $42,000 for each of the years 1971 through 1975.

On March 31, 1971, the date of the transfer at issue, Madrigrano conveyed all of his remaining 376 shares of Triangle stock to his sons, Joseph and Glenn. In exchange for the stock, Joseph and Glenn each executed a non–interest bearing promissory note in the amount of $7,110.97. The notes were made payable on March 31, 1972.

---

1. Taxpayers Vera Speca and Shirley M. Madrigrano are parties to this action by virtue of having filed joint income tax returns with their husbands in 1971.

At the time of the above transfer, Joseph was 23 years of age and a full–time, second–year law student who worked part–time during the school year and during summer vacations as an employee of Triangle. Glenn was 21 years of age, and a full–time undergraduate student. Like Joseph, Glenn also worked on weekends and during summer vacations for Triangle.

On March 31, 1971, appellant Speca also conveyed all of his remaining shares of Triangle stock to his sons, Peter and Gene, who were 10 and 7 years of age, respectively, at the time. Speca's sons were also expected to pay $7,110.97 in exchange for the stock received from their father. However, unlike the Madrigrano transfer, there were no sale documents or notes evidencing a stock sale between Speca and his children. Speca expected payment of the $7,110.97 due from each child to be made from Triangle's profits. Although minors, Peter and Gene received Triangle stock certificates without benefit of a named custodian, guardian, or trustee. The minutes of Triangle's January, 1972, shareholders' meeting note that Speca appeared on behalf of Gene and Peter and that he signed a "notice of waiver" on their behalf.

Upon completion of the above transfers, the shareholders of record held the following amounts of Triangle stock:

| Name | Shares |
|---|---|
| Joseph Madrigrano (Jr.) | 358 |
| Glenn Madrigrano | 358 |
| Mary Madrigrano | 170 |
| Karen Madrigrano | 170 |
| Armand Speca | 170 |
| Rosalyn Speca | 170 |
| Gene Speca | 358 |
| Peter Speca | 358 |

In a subsequent audit of appellants' federal income tax returns for the year 1971, respondent determined that the transfers of stock on March 31, 1971, were not bona fide and lacked economic substance. Therefore, that income from the transferred stock was included in the taxpayers–appellants' gross income. Respondent's position was upheld by the Tax Court and this appeal followed.

■ The first issue raised by appellants is the question of the proper standard of review. In a case such as this, this Court must inquire into who has true "shareholder" status. The mere record of stock ownership is not necessarily conclusive, for the true beneficial owner must be determined. "The issue of the appropriate standards for determining beneficial ownership is a question of law . . . , however, the question of whether an individual meets them and qualifies as a beneficial shareholder is one of fact." *Wilson v. Commissioner*, 560 F.2d 687 (5th Cir. 1977). It is quite apparent from the record that the trial judge used appropriate standards in making his decision, which leaves open the question of whether those standards were correctly applied to the facts of this case. Thus, the issue of shareholder status is a question of fact for purposes of review, and the trial court's determination should not be reversed unless his findings are clearly erroneous.

The issue of shareholder status in subchapter S corporations is not a new one. Examination of prior decisions reveals a consistent pattern of analysis involving the use of four specific factors. Those factors include: (1) Are the transferees within the family able to effectively exercise ownership rights of their shares; (2) Did the transferor continue to exercise complete dominion and control over the transferred stock; (3) Did the transferor continue to enjoy economic benefits of ownership after conveyance of the stock; and (4) Did the transferor deal at arm's length with the corporation involved. See *Duarte v. Commissioner*, 44 T.C. 193 (1965); *Beirne v. Commissioner*, 52 T.C. 210 (1969); *Beirne v. Commissioner*, 61 T.C. 268 (1973); and *Kirkpatrick v. Commissioner*, 36 T.C.M. (CCH) 1122 (1971).

■ In addition to the foregoing factors, Section 1.1373–(a)(2), Income Tax Regulations, provides as follows:

A donee or purchaser of stock in the corporation is not considered a shareholder unless such stock is acquired in a bona fide transaction and the donee or purchaser is the real owner of such stock. The circumstances, not only as of the

time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides of the transfer. Transactions between members of a family will be closely scrutinized.

For the purpose of determining federal income tax, "command over property or enjoyment of its economic benefits marks the real owners." *Anderson v. Commissioner,* 164 F.2d 870, 873 (7th Cir. 1947), *cert. den.* 334 U.S. 819, 68 S.Ct. 1085, 92 L.Ed. 1749 (1948). Any decision with respect to an intra–family transfer need be examined in light of these guidelines and the four factors mentioned previously.

For purposes of analysis, the instant case invites comparison to the decision rendered in *Kirkpatrick, supra.* In that case, petitioners Donald D. and Carolyn Kirkpatrick owned 52 percent of the outstanding shares of Quality Poultry and Egg Co., Inc., an Arkansas subchapter S corporation. The remaining 48 percent of Quality's shares were owned by the four Kirkpatrick children. After making use of the four factor analysis, the Tax Court determined that the ownership of 48 percent of the stock of Quality by the children did not lack economic reality and, for tax purposes, each child owned 12 percent of the common stock of Quality.

As in *Kirkpatrick,* the present case propounds the question of true shareholder status. Appellants contend that the Madrigrano and Speca factual findings are on all fours with the facts in the *Kirkpatrick* case, therefore requiring a similar outcome. We agree, that if upon comparison, the facts and circumstances surrounding both disputes are substantially the same, then appellants' position would be viewed favorably.

### I.

■ First to be considered is whether appellants' transfer of stock on March 31, 1971, gave the intended transferees the ability to effectively exercise their ownership rights. Appellant Speca transferred his remaining eighteen percent share own-ership equally to his sons, Gene and Peter, ages ten and seven. As minors, neither child exercised any influence in the operation of Triangle. The Tax court found no evidence that a custodian, guardian, or legally designated representative was ever appointed to represent the children's interests. These facts differ substantially from those in *Kirkpatrick.* There, the wife was named custodian for the children and was present at all corporate meetings. She fully participated in corporate decisions, acted independently, and exercised considerable influence over the affairs of "Quality." See *Kirkpatrick v. Commissioners,* 36 T.C.M. (CCH) at 1126. This was unlike the present situation where no independent person represented the interests of the minor transferee–children who were too young to adequately represent themselves. *Duarte v. Commissioner,* 44 T.C. at 197. Therefore, we conclude that stock transferees Gene and Peter Speca were unable to effectively exercise their ownership rights.

Likewise, we find that stock transferees Glenn and Joseph Madrigrano were unable to exercise their ownership rights. Although adults, both Glenn and Joseph were full–time students. In 1971, their contact with Triangle was limited to part–time employment during summers and on weekends. The record reflects no specific instance in which either Glenn or Joseph actually exercised their judgment with respect to a corporate decision. The absence of any corporate activity by either Glenn or Joseph in addition to the circumstances detailed below, lead us to believe that they also possessed no effective ownership rights.

### II.

The next factor for consideration involves the extent to which the transferor continues to exercise dominion and control over the transferred stock. The actions of appellant Speca evidence a retention of control in the transferred stock to the detriment of the transferees' supposed rights. Acting for his sons, Peter and Gene, Speca signed a waiver of notice as to the 1972 shareholders'

meeting and also approved the minutes of said meeting. The minutes of the 1974 shareholder meeting indicate that Peter and Gene were present by "proxy" without stating who the proxy was. However, Speca's signature again appears approving the minutes even though he was not on record as a shareholder. In contrast to *Kirkpatrick*, the presence of a custodian or legal representative acting on behalf of the Speca children is noticeably absent. Instead, we find appellant Speca in "control" of those shares purportedly sold.

The "control" exercised by appellant Madrigrano was accomplished through different means. Since its formation, Triangle operated as a beer distributor and wholesaler for the Joseph Schlitz Brewing Company (Schlitz). The relationship between Triangle and Schlitz consisted of an unwritten declaration of terms by which each party was free to buy or sell on an order–to–order basis. In October of 1972, Schlitz first learned that Madrigrano was no longer a shareholder of Triangle. Subsequently, Schlitz requested a meeting with Madrigrano to insure his continued participation in Triangle operations. Schlitz, through its sales manager Donald Hucko, informed Madrigrano that it wanted him to enter into an employment contract of at least a 5 or 10–year duration to insure his continued direction of Triangle's day–to–day operations. This request was based upon the fact that Mr. Madrigrano was no longer a Triangle shareholder.

In a memorandum sent to his superior at Schlitz, Hucko described his meeting with Madrigrano. The memorandum stated in part:

> He (Madrigrano) stated that these changes had been made in order to save a considerable sum of money for himself and Mr. Speca, . . . . At my request, Mr. Madrigrano wrote me the attached letter,[2] outlining what money had been saved by the current stock arrangement. He assured me that he has always been in

complete control of Triangle Wholesale Company, Inc., and will continue to do so. At my suggestion, an employment contract has been entered into which insures Mr. Madrigrano's leadership for at least ten more years.

The provisions of the resulting employment contract between Madrigrano and Triangle expressly stated that Madrigrano was hired "for a period beginning October 1, 1972 and ending September 30, 1982 as general manager, advisor, and consultant to management on all matters pertaining to the business of the Company." The contract itself was discussed at the January 11, 1972 shareholders' meeting. The minutes of the meeting stated that: "Schlitz made it emphatic since he (Madrigrano) was not a stockholder he must have a five year employment contract. Without this Triangle would be a shell and worthless corporation."

Based upon the record before us, we are convinced that Madrigrano's "presence" within Triangle was greater than that which normally flows from occupying an executive position. Madrigrano was the dominant figure who controlled corporate policy. As far as Schlitz was concerned, Madrigrano himself was the distributor of Schlitz products.

The March 31, 1971, transfer of stock was simply a paper transaction. It is evident that because Triangle depended for its business existence upon Schlitz, and Schlitz dealt with Triangle only because of Madrigrano's presence, neither Glenn nor Joseph could effectively challenge their father's judgment. As noted earlier, no specific instances can be found where either son exercised their judgment as shareholders with respect to a corporate decision. Thus, it is apparent that Madrigrano continued to effectively exercise complete dominion and control over the transferred stock as well as the corporation.

---

2. The "attached letter" specifically detailed the tax savings resulting from appellants' "sale" of their remaining interests in Triangle. In closing, the letter stated, "Don, this was only done for this reason (tax savings), all [these] figures can be substantiated and I also enclosed a work agreement so that you know I'll be here for ten more years."

### III.

We now turn to the question of whether appellants retained economic enjoyment of the benefits of ownership in the transferred shares of Triangle stock, and whether they dealt at arm's length with the corporation. To answer the first part of the above question is to determine whether the transferee–children were deprived of the economic incidents of ownership in their Triangle stock. In the case of the Speca children, the dividends distributed in cash were approximately equal to the increase in their tax liability due to the inclusion of Triangle's income on their returns. The same was true as to cash dividends distributed to Glenn and Joseph Madrigrano. In fact, an examination of the business records of Triangle reveals that the dividends actually received were in no way commensurate to the profits being made by Triangle. Moreover, the record reflects the failure of appellants to adequately explain the retention of large amounts of corporate income in the year 1971 and thereafter.

Further analysis reveals that during the same time period appellants were the recipients of sizeable unsecured, interest–free loans from Triangle. These loans remained outstanding long after appellants ceased ownership in Triangle. The payment of the loans was accomplished in part by appellants' use of their children's non–cash dividends. The non–cash dividends were taken by appellants as part payment for the stock "sold" to their children in March of 1971. The dividends were then applied by appellants against the balance owing Triangle on their loans.

The situation in the instant case is again clearly distinguishable from *Kirkpatrick*. In that case, the transferee–children also received insignificant corporate distribution amounts. However, the undistributed corporate income was eventually used for legitimate investment and expansion purposes. Any explanation proffered in the present case lacked such legitimacy. Although in both instances the children's dividends were tapped by a transferor–parent, only the *Kirkpatrick* children enjoyed the benefit of a custodian to insure a legitimate transaction. Taking these facts into consideration, it is our opinion that appellants retained the economic benefits of Triangle stock ownership to the detriment of their children. We also find that appellants failed to "deal at arm's length . . . either in obtaining [their loans] or paying them back." *Beirne v. Commissioner*, 61 T.C. at 277.

### IV.

The four prong analysis reveals a consistent pattern of appellants' continued involvement with the stock purportedly sold. The transferee–children were unable to effectively exercise the ownership rights of their shares. Appellants continued to exercise complete dominion and control over the transferred stock. Moreover, appellants failed to deal at arm's length with the corporation and continued to enjoy the economic benefits of stock ownership although no longer shareholders of record. When compared to the facts of *Kirkpatrick*, any suggested similarity disappears. Thus, the Court's conclusion in *Kirkpatrick* that the children's ownership of stock was bona fide and had economic reality is not warranted here. Unlike *Kirkpatrick*, the Tax court in this instance found, and we agree, that the transferee–children were not the true owners of the stock conveyed in March of 1971. Appellants continued as the beneficial owners of the stock purportedly sold and must be treated as such for income tax purposes.

### V.

Nonetheless, various points of contention raised by appellants remain for consideration. Appellants initially seek to discredit the trial court's partial reliance on the "control" factor. It is argued that the court below confused appellants' status as executives of Triangle and their resulting responsibility for operation of the corporation with control of the transferred stock. We find no merit in such a contention however. The evidence clearly showed that after their final conveyance of stock, Madrigrano and Speca "continued to completely control

the policies and operation of the corporation." *Duarte v. Commissioner*, 44 T.C. at 197. Standing alone, this fact is relatively unimportant. However, the presence of the additional factors discussed previously, refute appellants' claim. Appellants' children were unable to effectively exercise their stock ownership rights. Furthermore, appellants retained the economic benefits of stock ownership although supposedly no longer shareholders. The combination of these factors evidences "control" far beyond the normal relationship of a salaried executive to his corporation. Management of corporate affairs needlessly encompassed the control of shareholder rights as well.

■ Appellants also argue that the Tax court reallocated income in violation of the specific provisions of 26 U.S.C. § 1375(c), Internal Revenue Code of 1954.[3] Because § 1375(c) only allows reallocation between members of a family who are all shareholders of a Subchapter S corporation, appellants assert that they are not within the scope of said section for the reason that they are no longer shareholders. However, such an argument assumes appellants' shareholder status. That status is precisely the issue litigated below. The Tax court concluded that appellants remained the owners of the transferred stock for income tax purposes because the disputed transaction lacked economic substance. Thus, the statutory directive of § 1375(c) was not violated.

■ Appellants' final point of contention centers upon the Tax court's alleged reliance on appellants' tax avoidance motives.[4] It is argued that the Tax court placed undue emphasis on this factor in disallowing the purported transfer of stock. We cannot agree. While it is true that the trial court partially relied on appellants' apparent tax motives in reaching its conclusion, we note that it was but one factor in the lower court's overall analysis. The Tax court specifically recognized that, "While the desire to legitimately save taxes does not taint an otherwise bona fide transaction, it is also true

> [T]hat mere passage of title to income–producing property through devices which are valid under state law will not insulate the transferor against federal income tax liability unless the passage of title is accompanied by a complete shift of the economic, benefits of ownership, direct and indirect."

*Anderson v. Commissioner*, 164 F.2d at 873. In first determining whether there was a shift of economic benefits, the Tax court correctly applied the four prong analysis in reaching its conclusion. Thereafter, regardless of whether or not the trial court was influenced by appellants' tax avoidance motives, the whole subject of tax avoidance was merely ancillary to the central question of true shareholder status. Thus, any undue influence accorded this factor was of little import in light of other factors present.

## VI.

Having reviewed the evidence in its entirety, we necessarily conclude that the decision of the Tax court is not clearly erroneous. Substantial evidence exists to support the Tax court's finding that appellants' purported transfer of stock lacked sufficient economic substance and therefore appel-

---

3. Section 1375. Special Rules Applicable to Distributions of Electing Small Business Corporation. (c) Treatment of Family Groups—Any dividend received by a shareholder from an electing small business corporation (including any amount treated as a dividend under Section 1373(b) may be apportioned or allocated by the Secretary or his delegate between or among shareholders of such corporation who are members of such shareholder's family (as defined in Section 704(e)(3), if he determines that such apportionment or allocation is necessary in order to reflect the value of services rendered to the corporation by such shareholders.

4. Appellants further claim that without a finding of manipulation or chicanery in the disputed transaction, any resulting tax liability is improper. *Doyle v. Commissioner*, 286 F.2d 654, 659 (7th Cir. 1971). As with appellants' tax avoidance argument, we find neither the presence or absence of this "factor" to be controlling. We consider "manipulation" to be little more than a label in categorizing any resulting outcome of the analysis rendered.

lants are the beneficial owners of the transferred stock for income tax purposes. Accordingly, the judgment appealed from is AFFIRMED.