M. JOHN BORKOWSKI and LORRAINE BORKOWSKI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Borkowski v. Commissioner
Docket No. 14957-79.
United States Tax Court
T.C. Memo 1982-87; 1982 Tax Ct. Memo LEXIS 664; 43 T.C.M. (CCH) 593; T.C.M. (RIA) 82087; February 18, 1982. *664 (1) P, a dentist, incorporated his dental laboratory and transferred 40 percent of the stock of such corporation to 2 of his 5 children. Such corporation elected to be taxed as a small business corporation. Subsequently, P transferred 40 percent of the stock in such corporation, previously owned by him, to 2 of his other children. Held, such transfers were ineffective for Federal income tax purposes since they lacked economic reality, and P remained the beneficial owner of such stock; therefore, all the income of such corporation is taxable to P. (2) Such corporation used, in part, for business purposes an automobile owned by P and claimed deductions for the depreciation of such automobile. Held, since such corporation had no capital investment in such automobile, it is not entitled to deductions for depreciation thereof. (3) P purchased breeding cattle, and in connection with such purchase, paid fees, including initial management fees, to D. P claimed all of such initial management fees as a current deduction. Held, a portion of such fees was paid for the acquisition, rather than the raising, of such cattle; therefore, that portion of such fees must be capitalized. *665 Sec. 1.162-12(a), Income Tax Regs.
Robert E. Johnson, for the petitioners. *667 Michael J. Rusnak, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $ 8,418.16 for 1976 and $ 8,890.48 for 1977. After concessions by the parties, the issues for decision are: (1) Whether, when Dr. Borkowski transferred some of the stock in an electing small business corporation to his children, they became the beneficial owners of such stock so that Dr. Borkowski was not required to report the income thereon; (2) whether such corporation is entitled to deductions for depreciation of an automobile which was owned by the petitioners and which was used, in part, by such corporation; and (3) whether certain initial management fees paid in connection with the petitioners' purchase of breeding cattle are currently deductible or must be capitalized. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, M. John and Lorraine Borkowski, husband and wife, resided in Indianapolis, Ind., at the time they filed their petition in this case. They filed joint Federal income tax returns for 1976 *668 and 19757 with the Internal Revenue Service Center, Memphis, Tenn.
The petitioner M. John Borkowski is a dentist. During 1976 and 1977, Dr. Borkowski practiced dentistry in Indianapolis, specializing in crown and bridgework. Such practice required the use of a dental laboratory. Prior to December 1974, Dr. Borkowski maintained a dental laboratory as part of his dental practice and employed a laboratory technician.He discussed with his family the incorporation of such laboratory, and on December 6, 1974, at his suggestion, Avalon Laboratories, Inc. (Avalon), was organized as a corporation under Indiana law. Avalon's paid-in capital consisted of $ 1,000 in cash and equipment, which had been previously used in Dr. Borkowski's dental laboratory, with a value of $ 3,085. Such cash and equipment were contributed by Dr. Borkowski. At the time of Avalon's incorporation, 100 shares of common stock were issued to the following individuals: Dr. Borkowski
60 shares
Robert Borkowski
20 shares
Christine Borkowski
20 shares
Robert Borkowski and Christine Borkowski are children of the petitioners. Robert's date of birth is February 26, 1956, and Christine's date of birth *669 is April 12, 1960. Neither Robert nor Christine contributed anything to Avalon or to Dr. Borkowski in exchange for the shares issued to them. At the time Avalon was incorporated, Dr. Borkowski discussed with his family nd his attorney whether a custodian should be appointed for the shares issued to Robert and Christine. Although his attorney advised him to do so, Dr. Borkowski decided that a custodian should not be appointed. Through 1977, all of the stock certificates were kept with Avalon's corpdorate records, which were maintained at various times by Dr. Borkowski, his attorney, or his accountant. From the time of Avalon's incorporation through 1977, Dr. Borkowski, Mrs. Borkowski, Robert, and Christine were the directors of Avalon. During such period, Dr. Borkowski held the offices of president and treasurer, as well as chairman of the board of directors, and Mrs. Borkowski held the office of secretary. At the initial meeting of the board of directors, a fiscal year ending November 30 was chosen for Avalon, and it was decided that Avalon should elect to be taxed as a small business corporation, as defined in section 1371(b) of the Internal Revenue Code *670 of 1954. [1] Such election and fiscal year remained in effect during 1976 and 1977. Avalon's place of business was in a dental building, which was constructed by Dr. Borkowski in 1974. Such building was used by Dr. Borkowski and other dentists and consisted of various dental operating rooms, a common reception area, and a dental laboratory occupied by Avalon. Avalon did not have a lease, nor did it pay rent to Dr. Borkowski for its use of such space. However, Avalon charged Dr. Borkowski, who was one of the principal users of its services, fees which were approximately 20 percent less than those charged by another dental laboratory in Indianapolis. During 1976 and 1977, approximately 6 other dentists, who worked in Dr. Borkowski's building or were otherwise associated with him, used Avalon's services, and they all paid fees similar to those charged Dr. Borkowski. In 1976 and 1977, Avalon employed a lab manager, who managed the day-to-day operations of the lab. He ordered supplies, recommended the employees to be hired and dismissed, and recommended the fees to *671 be charged. However, Dr. and Mrs. Borkowski were the only persons with the authority to sign checks on behalf of Avalon; Dr. Borkowski supervised the operations of the lab; he hired and dismissed employees; and he made the final decision as to the fees to be charged, including those charged him. On November 13, 1976, Dr. Borkowski transferred 40 of his shares of Avalon to two of his other children, Catherine and David.Catherine's date of birth is March 26, 1963, and David's date of birth is January 29, 1965. After lsuch transfer, Avalon's stock was held as follows: Dr. Borkowski
20 shares
Robert
20 shares
Christine
20 shares
Catherine
20 shares
David
20 shares
100 shares
Dr. Borkowski made a concerted effort to encourage his family's interest in dentistry. Mrs. Borkowski worked on almost a full-time basis in the reception area of Dr. Borkowski's dental building.Christine and Catherine, who were students during 1976 and 1977, worked, at times, on weekends or during their vacations as chairside assistants for Dr. Borkowski and the other dentists in the dental building. Although they occasionally observed work in the laboratory, neither Christine nor *672 Catherine ever worked in the laboratory nor was an employee of Avalon. David, who was also a student during 1976 and 1977, did some work on the maintenance of the dental building. During 1976 and 1977, Robert was a full-time college student; he lived at college and commuted home most weekends. While he was at home, including the summer of 1976 and two summers while he was in high school, Robert worked in the laboratory, primarily maintaining its equipment, and also did maintenance work around the dental building. In December of each year, Avalon had regular annual meetings of its board of directors and shareholders. The corporate counsel and accountant also attended such meetings. In addition, the family had many informal meetings around the dinner table. At both the formal and informal meetings, Dr. Borkowski discussed the operations of his dental practice and the business of Avalon. However, he did not discuss with them the fees to be chared him and the other dentists for the services of Avalon. In November 1975, Dr. Borkowski purchased a medical reimbursement plan for Avalon's officers and employees. He did not discuss the purchase of such plan with his children or seek *673 their approval for such purchase. Yet, in 1977, Dr. Borkowski decided to change medical reimbursement plans and sought his children's approval for such change. Christine did not know that Dr. Borkowski was treasurer of Avalon. Also, she did not understand the function of a director, nor did she know the difference between a shareholder, an officer, and a director; she was unaware that during 1976 and 1977 she was a director of Avalon. Although at the time of trial Robert understood the role of a shareholder, he erroneously believed that he was vice president of Avalon at the time of its formation. At the meeting of Avalon's shareholders held on December 13, 1976, a distribution of $ 2,500 per shareholder was authorized from Avalon's earnings for the year ended November 30, 1976. Checks, each in the amount of $ 2,500 and dated February 8, 1977, were drawn payable to Dr. Borkowski, Robert, Christine, Catherine, and David. On the same day, or soon thereafter, Dr. Borkowski handed the checks to his children and requested that they endorse them over to Avalon. In exchange for such endorsements, Dr. Borkowski offered his children his demand notes, which provided for annual compound *674 interest at the rate of 6 percent. All of Dr. Borkowski's children complied with such requests. Dr. Borkowski had previously prepared such notes with his children's names. Neither at the time that he requested his children to endorse the distribution checks over to Avalon, nor previously, did Dr. Borkowski discuss with his children when he would repay such notes. Also, Dr. Borkowski unilaterally determined the interest rate on such notes; he did not discuss such interest rate with his children. At such time, the children were obtaining a 4-1/2- or 5-percent return on their savings accounts, and Dr. Borkowski could have borrowed money at an interest rate of 8 or 9 percent. After the children endorsed such checks, Dr. Borkowski retained custody and control over the demand notes. In late 1976 or early 1977, but prior to February 8, 1977, Dr. Borkowski borrowed $ 10,000 from Avalon. He did not discuss such loan with his wife or children, nor did he seek his children's approval; and he did not give a note or security to Avalon. Dr. Borkowski's children first became aware that he had borrowed money from Avalon when he requested that they endorse the distribution checks to Avalon *675 in order for him to repay such loan. Dr. Borkowski borrowed such $ 10,000 from Avalon because he needed funds for personal reasons, including the payment of taxes, the making of Christmas gifts to him employees, and the purchase of a boat for his family; and Avalon had such ready cash assets. During 1976 and 1977, Dr. Borkowski supported all of his children and paid such children's expenses, including Robert's college education expenses. On their Federal income tax returns for 1976 and 1977, the petitioners claimed their 5 children as dependents. On June 24, 1978, Dr. Borkowski paid Christine $ 210 as interest on the $ 2,500 he had borrowed from her. Christine, without her parent's knowledge, "loaned" such funds to Robert in order for him to purchase parts for the automobile which she used. Such automobile was owned by the petitioners. On August 4, 1978, Dr. Borkowski paid Christine $ 2,500 as the amount he had borrowed from her. Christine deposited such funds into her checking account.Soon thereafter, she wrote a check on such account for college tuition in the approximate amount of $ 2,100. On June 24, 1978, Dr. Borkowski paid Robert $ 210 as interest on the $ 2,500 *676 he had borrowed from him. On August 14, 1978, Dr. Borkowski paid Robert $ 2,500 as the amount he had borrowed from him. Robert deposited such funds into his bank account, and shortly thereafter, he wrote a check on such account for college tuition in the amount of $ 2,255. On November 24, 1978, Dr. Borkowski paid $ 2,769.25 to David as interest and principal that he had borrowed from him. On January 11, 1979, Dr. Borkowski paid $ 2,809.00 to Catherine as interest and principal that he had borrowed from her. Catherine endorsed such check to Robert to enable him to acquire an automobile, so that Robert could "give" the automobile that he used to Christine and Christine could "give" the automobile that she used to Catherine. The automobiles used by the petitioners' children were all registered in the petitioners' names; none of such automobiles was registered in the name of the child. Individual Federal income tax returns were filed by Robert, Christine, Catherine, and David for 1976 and 1977, and joint Federal income tax returns were filed for such years by Dr. and Mrs. Borkowski. On their joint return for 1976, Dr. and Mrs. Borkowski reported $ 2,677 as their pro rata share *677 (20 percent) of Avalon's taxable income for its taxable year ending November 30, 1976, and each of the children reported 20 percent of Avalon's income on his or her individual return for 1976. On their joint return for 1977, Dr. and Mrs. Borkowski reported $ 2,914 as their pro rate share (20 percent) of Avalon's taxable income for its taxable year ending November 30, 1977, and each of the children reported 20 percent of Avalon's income on his or her individual return for 1977. Dr. Borkowski or Mrs. Borkowski paid their children's tax liabilities for 1976 and 1977. In April 1978, Dr. Borkowski was advised by an agent of the IRS that the petitioners' return for 1976 was under examination. In May 1978, such agent sent a letter to the petitioners in which she advised them that the petitioners' returns for 1976 and 1977 and Avalon's returns for its fiscal years ending November 30, 1976, and November 30, 1977, were being audited.In June 1978, such agent raised with Dr. Borkowski's accountant the issue of the ownership of the Avalon stock by the children of Dr. Borkowski. In his notice of deficiency, the Commissioner determined that in substance, Dr. Borkowski was the owner of 100 *678 percent of the stock of Avalon and that, therefore, the full amount of its earnings and profits should have been reported on the petitioners' returns for 1976 and 1977. In August 1975, Dr. Borkowski purchased a 1975 Oldsmobile. Such automobile was purchased primarily for the use of his family. During 1976 and 1977, such automobile was used, part of the time, by Avalon to pickup supplies and to pickup and deliver work from other dentists, and Avalon and Dr. Borkowski shared the expenses for such automobile. Avalon did not own an automobile, and during such period, the Oldsmobile was registered in Dr. Borkowski's name. On its Federal corpaorate income tax returns for its taxable years ending November 30, 1976, and November 30, 1977, Avalon claimed depreciation deductions with respect to the Oldsmobile of $ 2,081.33 for each of such years. In his notice of deficiency, the Commissioner disallowed such deductions in their entirety on the ground that the Oldsmobile was not the property of Avalon. Therefore, the Commissioner determined that Avalon's taxable income was understated by $ 2,081.33 for each of such years and that accordingly the petitioners had understated the earnings *679 and profits of Avalon for 1976 and 1977 to be reported by them. On December 19, 1977, Dr. Borkowski purchased 100 breeding cattle from Duck Creek Cattle Company, Inc. (Duck Creek), for $ 45,000. On such date, he entered into an "Owner's Maintenance and Feeding Contract" with Duck Creek. Pursuant to such contract, Dr. Borkowski paid Duck Creek $ 6,000 ($ 60 per cow) as a breeding fee and $ 4,000 ($ 40 per cow) as an initial management fee; such fees were nonrefundable. The initial management fee covered the following services: Amount per
Service
Head
Total
Veterinarian and medication - cow
$ 8.65
$ 865
Veterinarian and medication - calf
6.75
675
Trucking
3.00
300
Miscellaneous - ear tags, labor crew
6.60
660
Duck Creek commission and
service - assembling cattle herd
15.00
1,500
Duck Creek's usual manner of operation was to act as manager (agent) for investors by acquiring cattle on their behalf and contracting with farmers who provided the land on which the cattle grazed and who took care of the feeding of the cattle. Usually, Duck Creek had to acquire the cattle for an investor and to transport such cattle to the farm where they would *680 be maintained, but sometimes such cattle would already by on the farm where they would be maintained.There is no record of whether or not Dr Borkowski's cattle were transported to the farm where they were maintained. In any event, the full $ 40 per head initial management fee was charged to all "owners" at the time they entered into the "owner's contract," irrespective of whether transportation charges were actually incurred. The $ 15 per head fee for commission and assembling the herd was not a commission per se but represented Duck Creek's profit on the transaction. On their return for 1977, the petitioners capitalized and amortized the $ 6,000 breeding fee and claimed a current deduction for the $ 4,000 initial management fee, which they reported as "sales charges--cattle." In his notice of deficiency, the Commissioner allowed the petitioners' amortization of the breeding fee and allowed a current deduction for the portion of the initial management fee, $ 1,540, attributable to veterinarian and medication services; he disallowed a current deduction for the portion of such fee, $ 2,460, attributable to trucking, miscellaneous (ear tags, labor crew), and Duck Creek's fee for *681 assembling the herd. Instead, he determined that such expenses were capital expenditures, recoverable through depreciation, and adjusted the petitioners' claimed deduction for depreciation of their cattle accordingly. OPINION The first issue for decision is whether all of Avalon's taxable income for its fiscal years ending November 30, 1976, and November 30, 1977, is attributable to Dr. Borkowski and should have been included in the petitioners' gross income for the calendar years 1976 and 1977. The resolution of such issue is dependent upon whether the petitioners' children were the true and beneficial owners of 80 percent of Avalon's stock during such years, rather than mere holders of legal title to such stock. The Commissioner contends that the transfers of stock to Robert, Christine, Catherine, and David were not effective for Federal income tax purposes, because their ownership of stock in Avalon was not bona fide and lacked economic reality. In support of such contention, he relies on the line of cases ( Speca v. Commissioner,630 F. 2d 554 (7th Cir. 1980), affg. a Memorandum Opinion of this Court; Beirne v. Commissioner,61 T.C. 268 (1973); *682 Beirne v. Commissioner,52 T.C. 210 (1969); Anderson v. Commissioner,164 F. 2d 870 (7th Cir. 1947), affg. 5 T.C. 443 (1945); Fundenberger v. Commissioner,T.C. Memo. 1980-113) which found intra-family transfers of stock in an electing small business corporation ineffective for Federal tax purposes, and he distinguishes the one case ( Kirkpatrick v. Commissioner,T.C. Memo. 1977-281) which found such a transfer to be effective for such purposes.The petitioners take the reverse position, arguing that their case is factually indistinguishable from Kirkpatrick and factually distinguishable from those cases which have reached the opposite conclusion. Ownership of property for Federal income tax purposes is a question of fact to be determined from all the facts and circumstances. Schoenberg v. Commissioner,302 F. 2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner,66 T.C. 785 (1976). In determining the true owner of corporate stock, *683 beneficial ownership, as opposed to mere legal title, is decisive. Beirne v. Commissioner,61 T.C. at 277; Hook v. Commissioner,58 T.C. 267 (1972); Duarte v. Commissioner,44 T.C. 193 (1965). In making such determination, "command over property or enjoyment of its economic benefits marks the real owners." Anderson v. Commissioner,164 F. 2d at 873; see Speca v. Commissioner,630 F. 2d at 557. That a transfer is valid under State law is not conclusive of its bona fides for purposes of Federal taxation unless such transfer is accompanied by a complete shift of the direct and indirect economic benefits of ownership. Commissioner v. Tower,327 U.S. 280 (1946); Anderson v. Commissioner,supra.The substance of a transaction, rather than its mere form, is determinative of its tax consequences. Commissioner v. Court Holding Co.,324 U.S. 331 (1945). Transfers of property between family members are "subject to special scrutiny in order to determine *684 if they are in economic reality what they appear to be on their face." Fitz Gibbon v. Commissioner,19 T.C. 78, 84 (1952). With respect to transfers of stock of an electing small business corporation, section 1.1373-1(a)(2), Income Tax Regs., provides, in part, that: A donee or purchaser of stock in the corporation is not considered a shareholder unless such stock is acquired in a bona fide transaction and the donee or purchaser is the real owner of such stock. The circumstances, not only as of the time of the purported transfer but also during the periods preceding and following it, will be taken into consideration in determining the bona fides of the transfer.Transactions between members of a family will be closely scrutinized. Such provision makes clear that if a transaction between members of a family is not bona fide, its effectiveness as an income-splitting device will be frustrated. Duarte v. Commissioner,44 T.C. at 197. [2]
*685 In making the factual determination of whether children who received stock in an electing small business corporation beneficially owned such stock so as to be taxed on their distributive shares of the income of such corporation, the cases have applied the following four criteria, although no one criterion has been determinative: (1) Are the transferees within the family able to exercise effectively ownership rights over their shares; (2) did the transferor continue to exercise complete dominion and control over the transferred stock; (3) did the transferor continue to enjoy the economic benefits of ownership after conveyance of the stock; and (4) did the transferor deal at arm's length with the corporation involved. Speca v. Commissioner,630 F. 2d at 556 and cases cited therein. After carefully applying such criteria to the record, we are convinced that Dr. Borkowski's transfers of stock in Avalon to his children were not bona fide and lacked economic reality, and that during 1976 and 1977, he, and not his children, was the beneficial owner of such stock.
(1) Were *686 the petitioners' children able to exercise effectively ownership rights over their shares?
The petitioners contend that their children actively participated in the management of Avalon and that they were able to exercise ownership rights over their shares, but such contention is not supported by the record. The shares transferred to such children were registered in their own names; no custodian was appointed for the shares issued to Christine, Catherine, and David, all of whom were minors. The absence of a custodian weighs heavily against the petitioners.See Speca v. Commissioner,supra; Beirne v. Commissioner,61 T.C. 268; Beirne v. Commissioner,52 T.C. 210; Duarte v. Commissioner,44 T.C. at 197; compare Kirkpatrick v. Commissioner,supra. Dr. Borkowski rejected the proposal to appoint a custodian because he said that he wished to give the children greater control over their stock, but in fact, the absence of a custodian had the opposite effect. Had there been a custodian holding the stock of the minor children, such custodian would have had a fiduciary duty to watch over the affairs of *687 Avalon (see Ind. Ann. Stat. sec. 30-2-8-4 (Burns Supp. 1981)), and such custodian might have interposed an objection to any actions by Dr. Borkowski which appeared to be contrary to the best interests of the children; for example, such a custodian might have questioned the unsecured loan to Dr. Borkowski. It is clear from the record that the children and insufficient understanding of the business of Avalon and their rights as shareholders or directors to protect themselves, and since such children were still dependents and were receiving their support from Dr. Borkowski, it might have been unwise for them to interfere with his management of the affairs of Avalon even if they had the knowledge or desire to do so. Thus, the absence of a custodian effectively precluded the children from exercising their ownership rights over their shares. Also, Avalon's articles of incorporation provided that a shareholder could not dispose of his stock to a nonshareholder, other than by gift or bequest, without first offering such stock to the other shareholders on a pro rata basis. However, with the exception of Robert, the children were minors, and since no custodian had been appointed for them, *688 they would have been effectively unable to exercise the ownership right of selling their shares or purchasing additional shares if offered.See Ind. Ann. Stat. sec. 27-1-12-15 (Burns 1975); Ind. Ann. Stat. sec. 34-1-2-5.5 (Burns Supp. 1981). The petitioners argue that Mrs. Borkowski was actively involved with Avalon's affairs and that, like Mrs. Kirkpatrick, she actively looked after her children's interests. However, the record does not support such argument. Although she held the positions of director and secretary of Avalon, there is nothing in the record to show that she took any part in the management decisions. On the contrary, her only active involvement was with Dr. Borkowski's dental practice. What is more, since she was not appointed custodian, she had no affirmative duty or authority to look after her children's interests. Dr. Borkowski testified that he wanted to make Avalon a family venture and that he only gave stock in Avalon to those of his children who had an interest in dentistry. The record shows that through a discussion of his dental practice Dr. Borkowski encouraged his children to develop an interest in dentistry, and while we do not doubt that both *689 formal and informal meetings were held where Avalon's affairs were discussed, the record, specifically the corporate minutes of Avalon, reveal few instances where other than ministerial corporate affairs were discussed or acted upon. There is no record in such minutes of the fees charged by Avalon, of Avalon's arrangement with Dr. Borkowski concerning its rental of space in his dental building, of its arrangement for the use of Dr. Borkowski's Oldsmobile, or of the $ 10,000 loan to Dr. Borkowski. The only management decisions discussed in such minutes were the raising of the lab manager's salary and a change in the medical reimbursement plan for Avalon's officers and employees, which actions were initiated by Dr. Borkowski. However, with respect to the medical reimbursement plan, Dr. Borkowski had previously purchased such a plan without discussing the matter with his wife or children. What is more, during 1976 and 1977, all of the children were full-time students and were too young to exercise, independent of a custodian, their ownership rights. Only Robert worked in the laboratory, but his work was similar to that performed by a dental technician; although such work may have *690 given him insight into the working of the laboratory, it did not involve him with management decisions. See Speca v. Commissioner,supra. At trial, Robert testified that he was a vice president of Avalon; yet, no such position existed. Christine testified that she was unaware that she was a director of Avalon, that she did not know the difference between an officer, a director, and a shareholder, and that she never commented upon Avalon's business affairs. Robert and Christine are the oldest of the petitioners' children who were shareholders in Avalon. As such, we assume that they would have been more cognizant of their ownership rights than Catherine and David, who were only 13 and 11 years old in 1976. Since Robert and Christine were not fully aware of their ownership rights and the business affairs of Avalon, we are confident that Catherine and David would have been even less aware of their ownership rights. "[T]axation is an intensely practical process concerned less with legal formalities than with economic realities and that tax consequences flow from the substance rather than the form of a transaction." Anderson v. Commissioner,164 F. 2d at 873. *691 The reality of the situation was that only Dr. Borkowski actively participated in the management decisions of Avalon, and in substance, the petitioners' children were unable to exercise effectively their ownership rights in the shares transferred to them. Speca v. Commissioner,supra; Anderson v. Commissioner,supra;Beirne v. Commissioner,61 T.C. 268; Beirne v. Commissioner,52 T.C. 210; Duarte v. Commissioner,supra.
(2) Did Dr. Borkowski continue to exercise complete dominion and control over the transferred shares?
Although Dr. Borkowski complied with the formal requirements of giving his children notices of shareholder meetings and having his children attend such meetings, the record, as a whole, convinces us that Dr. Borkowski continued to exercise complete dominion and control over the shares that he transferred to his children. We have already pointed out that Dr. Borkowski made all the significant decisions in the management of the affairs of Avalon and that the children were given no opportunity to pass on such actions. Dr. Borkowski testified that he created the positions *692 of directors and corporate officers for his children's impression, and that although a child may have held such a position, he did not expect or think it wise for the child to actually exercise the duties of such position. For example, with respect to why his children did not have authority to sign checks on behalf of Avalon, Dr. Borkowski testified that "It wouldn't be very smart for a child to write checks" and that he did not "see the point in * * * [his children] having the checkbook." Thus, although, in form, two of the children were directors of the corporation and four of the children were shareholders, they did not understand their rights, and they were given no opportunity to assert those rights. In fact, the record reveals that Dr. Borkowski controlled the affairs of Avalon as if he held all its stock. The petitioners argue that Dr. Borkowski only transferred stock in Avalon to such of his children as had an interest in Avalon. However, his motive for transferring such stock is not relevant. The question is whether he continued to exercise control over such stock after its transfer.Although he did not transfer stock to Catherine and David when Avalon was first created, *693 he did so when they were only 13 and 11, respectively, and there is not one scintilla of evidence that at their tender ages they interferred in any way with Dr. Borkowski's management of Avalon or that they ever asserted their rights as owners of the stock. The petitioners also argue that when Dr. Borkowski transferred stock to Catherine and David in 1976, he transferred his own shares and did not dilute the holdings of Robert and Christine. Such argument is an attempt to bring their case within Kirkpatrick and distinguish those cases (Beirne and Fundenberger) where such dilution occurred. The lack of such dilution bears in favor of the petitioners, but such circumstance is but one evidentiary factor to be considered and weighed against the other evidence in the record. See Speca v. Commissioner,supra. Based on the record as a whole, we are convinced that, as a practical matter, Dr. Borkowski continued to exercise complete dominion and control over the transferred stock. (3) Did Dr. Borkowski continue to enjoy the economic benefit of ownership after the transfer of the stock to his children?
During the years in issue, the only dividend paid by Avalon *694 was the $ 2,500 per shareholder distributed by checks on February 8, 1977. Dr. Borkowski handed such checks to his children but, at such time, requested that they endorse their checks to Avalon in order for him to repay the $ 10,000 which he had borrowed from Avalon. In exchange for such endorsements, Dr. Borkowski offered his demand notes, which provided for interest, compounded annually, at the rate of 6 percent. Subsequently, Dr. Borkowski repaid such notes with interest. The petitioners argue that such transactions are evidence that their children received the economic benefit of ownership of Avalon stock. We disagree. When Dr. Borkowski borrowed the $ 10,000 from Avalon, he did so without discussing such loan with his children. He did not give a note to Avalon in recognition of such indebtedness, nor did he pledge any security for such loan. Also, the record fails to show that he paid interest on such loan. Thus, for the month or two that such loan was outstanding, Dr. Borkowski received the identical benefits of ownership as if he were the sole owner of Avalon's stock. Moreover, although Dr. Borkowski purported to execute notes in favor of his children when they endorsed *695 the checks to Avalon, such notes were illusory. Dr. Borkowski had the notes prepared without any consultation with the children, and he alone decided on the interest rate to be included therein.The notes were payable on demand and were not due at any fixed date. In addition, except for Robert, the other children were all minors, and there was no one to demand payment on their behalf. What is more, at all times, the notes were retained by Dr. Borkowski. In addition, no payments of interest or principal were made on any of such notes until June 1978, after Dr. Borkowski learned that the returns of the petitioners and Avalon were being audited and that the ownership of stock by his children was in issue. Almost immediately thereafter, Dr. Borkowski made interest payments to Christine and Robert, and he fully repaid all of such notes by January 1979. The timing of such payments raises a question as to whether the payments may have been motivated by the IRS audit and as to whether the children would have been paid in the absence of such audit. Furthermore, the use of the funds paid to the children casts additional doubt on whether such funds were used for the benefit of Dr. Borkowski *696 or for the children. On August 4, 1978, Dr. Borkowski paid Christine the $ 2,500 which he had nominally borrowed from her, but soon thereafter, she used such funds to pay her college tuition. Similarly, on August 14, 1978, Dr. Borkowski paid Robert the $ 2,500 which he had ostensibly borrowed from him, but shortly thereafter, Robert used such funds to pay his college tuition. Previously, Dr. Borkowski had paid both Christine and Robert $ 210 as interest on their notes, and such money may have been used for their benefit. However, Dr. Borkowski testified that he supported all of his children, and under Indiana law, a parent's obligation of support continues until age 21 unless the child has become emancipated at an earlier date. Such obligation may, depending on the parents' financial resources and station in life, include expenses for higher education. See Ind. Ann. Stat. sec. 31-1-11.5-12(d) (Burns 1980); Brokaw v. Brokaw,398 N.E. 2d 1385 (Ind. Ct. App. 1980); DeLong v. DeLong,315 N.E. 2d 412 (Ind. Ct. App. 1974). Although in August 1978 Robert was *697 22 years old, it is likely that the petitioners were still supporting him, and certainly with respect to Christine, the petitioners had a continuing obligation of support. The funds paid to Robert and Christine were used to defray expenses that otherwise would have been borne by Dr. Borkowski, and it is not clear that Robert and Christine received any separate or independent benefit from such funds. With respect to Catherine, the funds transferred to her as payment of the interest and principal on her note were, in effect, used to purchase an automobile which was registered in the petitioners' names. It is likely that Dr. Borkowski would have furnished an automobile for the use of Catherine in any event and, under the circumstances, the furnishing of an automobile might have been part of the support obligation of the petitioners. Thus, it is not at all clear that her holding stock in Avalon resulted in her receiving anything more than she would otherwise have received from her parents. The evidence with respect to David is unclear. Dr. Borkowski testified that he could not recall what David did with the funds paid to him, but he believed that David may have purchased a sailboat *698 with such funds. The record fails to disclose in whose name such boat was registered, but since David was only 13 years old at the time, the boat may have been registered in the petitioners' names. Here, too, it is not clear that David acquired anything in addition to what his parents would otherwise have furnished him. In summary, the petitioners have failed to meet their burden of proving that Dr. Borkowski's children received the economic benefit of their purported stock ownership. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Rather, it is clear that Dr. Borkowski used the funds that he allegedly borrowed from his children for his own personal benefit (compare Kirkpatrick v. Commissioner,supra), and the repayments of the loans may have been used to support the children or to make gifts to them that would have been made in any event. In substance, we see little difference between the manner in which he structured the transactions and an arrangement under which he borrowed $ 12,500 from Avalon and used such funds for his own personal purposes. (4) Did Dr. Borkowski deal at arm's *699 length with Avalon?
We have already pointed out that when Dr. Borkowski borrowed $ 10,000 from Avalon, he did not give a note or security for such loan, nor is there any evidence that he paid interest on such loan. Such conduct is evidence that Dr. Borkowski did not deal at arm's length with Avalon. See Speca v. Commissioner,supra; Beirne v. Commissioner,52 T.C. at 219; Fundenberger v. Commissioner,supra; compare Kirkpatrick v. Commissioner,supra. In addition, there is no evidence in the record that the arrangement that Dr. Borkowski had with Avalon for the use of space in his dental building was based on arm's length negotiations. Avalon was not charged rent for the space used by it, but Dr. Borkowski was charged fees that were lower than the prevailing rates for the services which he received. The record fails to show that such arrangement resulted from arm's length bargaining or that the discount represented a fair rental for the space. In summary, although Dr. Borkowski may have dealt with Avalon on an arm's length basis, we cannot conclude on the record that he did so. While the facts of this *700 case are not as egregious as those of Anderson,Beirne, and Fundenberger, the petitioners have not shown that their actions come up to the level of the arm's length dealings in Kirkpatrick. Applying the four legal criteria to the facts of this case, we conclude that the children were unable to exercise effectively ownership rights over the stock transferred to them, that Dr. Borkowski continued to exercise complete dominion and control over the stock he transferred, that he retained the economic benefits of ownership of such stock, and that Dr. Borkowski did not deal at arm's length with the corporation. Accordingly, the petitioners must include in their gross income for 1976 and 1977 100 percent of Avalon's taxable income for its taxable years ending in such years. The next issue we consider is whether Avalon is entitled to depreciation deductions with respect to the 1975 Oldsmobile. The petitioners contend that such automobile was used exclusively by Avalon and that the depreciation deductions claimed by Avalon had the same economic effect as if the petitioners had leased such automobile to Avalon. As the petitioners view the transaction, had they leased the *701 Oldsmobile to Avalon, they would have received rental income which would have been exactly offset by the depreciation deductions, and Avalon would have been entitled to rental expense deductions equal to the depreciation deductions claimed by it. On the other hand, the Commissioner contends that Avalon did not have an economic interest in the Oldsmobile and did not sustain an economic loss by reason of the depreciation of such automobile; therefore, he takes the position that Avalon is not entitled to depreciation deductions. We agree with the Commissioner. Generally, section 167 provides that there shall be allowed as a deduction for depreciation a reasonable allowance for exhaustion, wear, and tear of property used in the taxpayer's trade or business or held for the production of income. Sec. 167(a); sec. 1.167(a)-1(a), Income Tax Rega. Traditionally, such allowance is primarily intended to provide a nontaxable fund to restore property used in producing income at the end of such property's useful life and is granted to the person who uses property in his *702 trade or business, or for the production of income, and who incurs a loss resulting from the depreciation of capital that he has invested. Helvering v. F. & R. Lazarus & Co.,308 U.S. 252, 254 (1939); Ryman v. Commissioner,51 T.C. 799, 802 n. 5 (1969). Thus, although ownership is not a prerequisite to a right to a depreciation deduction, only if the taxpayer has made a capital investment in property is he entitled to a depreciation deduction with respect to such property. Miller v. Commissioner,68 T.C. 767, 775 (1977); Blake v. Commissioner,20 T.C. 721, 732 (1953); Gladding Dry Goods Co. v. Commissioner,2 B.T.A. 336, 338 (1925). During 1976 and 1977, the Oldsmobile was registered in the name of Dr. Borkowski. Although Avalon paid some of the expenses of such automobile during such period, it is clear that it did not have a capital investment in such automobile. Accordingly, Avalon is not entitled to any depreciation deductions with respect to such automobile. Miller v. Commissioner,supra;Gladding Dry Goods Co. v. Commissioner,supra. *703 There is no merit in the petitioners' argument that the arrangement should be treated as if they leased the Oldsmobile to Avalon. The fact is no such lease existed, and "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 149 (1974). Moreover, even if we were to treat the arrangement as a lease of the automobile, the petitioners have failed to offer any evidence as to the fair rental value of the Oldsmobile or their basis for depreciation. Apparently, they assume that such a rental would equal the depreciation deductions claimed by Avalon; but we cannot make such assumption. The petitioners offered no evidence of the original purchase price of the Oldsmobile, or the fair market value of such automobile at the time it was allegedly converted to business use, [3] or such automobile's salvage value, if any. Accordingly, we have no means of determining the fair rental *704 value of such automobile or the amount, if any, of depreciation deductions to which the petitioners might be entitled. Also, Dr. Borkowski testified that such automobile was not used exclusively by Avalon, but rather was used, in part, by his family. Where property is used partly for business and partly for personal uses, the cost basis of the asset must be apportioned between such uses, and only the business portion would be subject to an allowance for depreciation. Clark v. Commissioner,158 F. 2d 851 (6th Cir. 1946), affg. a Memorandum Opinion of this Court; James v. Commissioner,2 B.T.A. 1071 (1925). Since the petitioners have the burden of proving the extent of such business use (Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,supra), their failure to produce any evidence as to the extent of Avalon's use of such automobile constitutes an additional reason for sustaining the Commissioner's determination on this issue. *705 The final issue for decision is whether the portion of the payment to Duck Creek attributable to trucking, miscellaneous (ear tags, labor crew), and Duck Creek's fee for assembling Dr. Borkowski's cattle herd is currently deductible, as an expense of raising livestock, or must be capitalized, as part of the purchase price of such cattle.Generally, the costs incurred in the acquisition or development of capital assets and other property used in a trade or business must be capitalized. Sec. 263(a). A farmer, such as Dr. Borkowski, who uses the cash method of accounting and who operates a farm for profit is entitled to currently deduct the expenses paid in raising livestock; but "Amounts expended in purchasing work, breeding, dairy, or sporting animals are regarded as investments of capital, and shall be depreciated." Sec. 1.162-12(a), Income Tax Regs.; United States v. Catto,384 U.S. 102, 106 (1966); Wiener v. Commissioner,58 T.C. 81, 88 (1972), affd. per curiam 494 F. 2d 691 (9th Cir. 1974). [4]
*706 The petitioners contend that the full amount of the initial management fee was incurred in raising livestock and therefore is currently deductible. The Commissioner has allowed a deduction for a portion of such fee, but he contends that the portion attributable to trucking, miscellaneous, and Duck Creek's fee for assembling the herd does not relate to the raising of livestock, but rather to their acquisition and therefore was a capital expenditure recoverable through depreciation. We agree with the Commissioner. Whether a particular expenditure relates to the raising of livestock is a question of fact, and the petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,supra. The portion of the initial management fee in dispute was paid to Duck Creek for its services in selecting Dr. Borkowski's cattle, for transporting such cattle (if necessary) to the farm where they would be maintained, and for identifying them by means of ear tags since such cattle were to be commingled with the cattle of other owners. Also, *707 the fee of $ 15 per head paid to Duck Creek for assembling the herd, although not a commission per se, was intended to be additional compensation for its services. Moreover, even if all of such services were not performed, where, for example, Duck Creek already owned the cattle that were sold or such cattle were already on the farm where they were to be maintained, the amount of the initial management fee charged to an owner was not reduced to reflect such savings to Duck Creek. Accordingly, we find and hold that the initial management fee, other than the portion of such fee allocable to veterinarian and medication services, was totally unrelated to the raising of Dr. Borkowski's cattle; rather, such fee was part of the acquisition cost of such cattle and therefore must be capitalized. To reflect the concessions made by the Commissioner, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. While a desire to avoid taxes will not in itself taint an otherwise bona fide transfer of property, we are aware that an electing small business corporation may present a vehicle for shifting income among family members. See Speca v. Commissioner,T.C. Memo. 1979-120, affd. 630 F. 2d 554↩ (7th Cir. 1980).
3. Where property is converted from personal to business use, the basis for computing depreciation deductions is the lesser of the fair market value of such property at the time of conversion or such property's basis. Sec. 1.167(g)-1, Income Tax Regs.↩
4. Even though Dr. Borkowski contracted with Duck Creek for the management of his cattle, as owner of such cattle, he bore the risk of their loss. Accordingly, he is entitled to the same tax benefits afforded farmers as if he had raised the cattle himself. Therefore, to the extent the expenses in issue relate to the cost of raising his cattle, such expenses are currently deductible. Maple v. Commissioner,440 F. 2d 1055, 1057 (9th Cir. 1971), affg. a Memorandum Opinion of this Court; Duggar v. Commissioner,71 T.C. 147, 157-158↩ (1978).