**UNITED STATES of America,**
**Appellant,**

**v.**

**Albert J. PIRRO, Jr., Defendant–**
**Appellee,** ·

**Anthony G. Pirro, Defendant.**

**No. 1632, Docket 99–1760.**

United States Court of Appeals,
Second Circuit.

Argued: March 15, 2000

Decided: May 03, 2000

---

Elliott B. Jacobson, Assistant United States Attorney for the Southern District of New York (Cathy Seibel, Justin S. Weddle, Baruch Weiss, Assistant United States Attorneys, on the brief), on behalf of Mary Jo White, United States Attorney for the Southern District of New York, for appellant.

Robert J. Giuffra, Jr., Sullivan & Cromwell, New York, N.Y. (Gustave H. Newman, Newman Schwartz & Greenberg, New York, NY, on the brief), for appellee.

Before: McLAUGHLIN, KATZMANN, and GIBSON,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge:

The United States appeals from an order of the district court dismissing allegations of an indictment charging Albert Pirro with failing to report the ownership interest of the Chairman[2] of the Board of Hudson Valley Hospital Center on the in-

come tax return of Distinctive Properties of Croton, Inc., an S Corporation, in violation of 26 U.S.C. § 7206(1). The dismissed allegations also charge Pirro with misstating his own ownership interest in Properties and failing to reflect all payments that Properties made to a company wholly owned by the Chairman. The government argues that the district court erred in dismissing these allegations. We affirm.

The dismissed allegations form only a portion of Count 67 of the indictment. The count alleges that early in 1991, the Chairman brought to Pirro's attention the availability of a commercial office building in Croton, New York. Properties purchased the building for $950,000 and leased it to Hudson Valley Ventures, Inc. Ventures planned to use the building as a professional building and lease space to physicians affiliated with the Hospital.[3]

While Ventures leased the building, it made lease payments and other payments related to the building's operation to Properties. Also during that time, Properties made a series of payments by check to PM Messenger, a company wholly owned and controlled by Pirro. Messenger then made checks payable in the precise amount received from Properties to a company wholly owned by the Chairman. These payments totaled $135,726.70. In July 1993, Ventures purchased the building from Properties for $1,500,000. After Properties closed on the sale of the building to Ventures, another company wholly owned by Pirro made a payment by check in the amount of $156,572.57 to the Chairman's company.

Count 67 alleges that the Chairman acquired a 45% "ownership interest" in Properties at or about the same time Properties closed on the purchase of the building.

---

\* Hon. John R. Gibson, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

2. The indictment refers to the Chairman without naming him, although the briefs do so.

We think it appropriate to use the title Chairman as used in the indictment.

3. Ventures and the Hospital were both owned by the same parent corporation, Westchester–Putnam Health Management Services, Inc.

It also alleges that Pirro assisted the Chairman in concealing his ownership interest in Properties and his receipt of the monies from Messenger in violation of what Pirro believed to be the Chairman's fiduciary duty and duty of disclosure to the Hospital and its parent corporation.

The remaining counts of the indictment charge either Pirro or his brother, or both, with conspiracy to violate the tax laws and with numerous violations of 26 U.S.C. §§ 7201, 7206(1), and 7206(2). They allege, among other things, that Pirro's various businesses paid for his personal expenses and that the tax returns for these companies disguised the expenditures as business expenses. Pirro's brother allegedly assisted in the preparation of the false returns.

The crime alleged in Count 67 is that Pirro willfully and knowingly made and subscribed a false 1992 tax return for Properties in violation of section 7206(1). Pirro's motion to dismiss challenged only subpart (2) of paragraph 56 in Count 67,[4] claiming that it failed to state an offense. Subpart (2) alleged that Pirro:

> failed to report thereon the hospital Chairman's ownership interest in [Properties], misstated thereon ALBERT J. PIRRO, JR.'s ownership interest in [Properties], and failed to reflect thereon all of the payments [Properties] had made, through [Messenger], to the hospital Chairman's wholly owned company.

The district court held that Pirro's motion was properly before it, as the failure of an indictment to charge an offense can be addressed at any time. The court stated that an indictment may be dismissed where the government's theory of liability is legally insufficient and that the existence of a known legal duty owed by a taxpayer is a question of law. The court

found that whether there is a legal obligation to include an individual with an "ownership interest" on the tax return of an S corporation is debatable and thus should not supply the predicate for criminal liability. The district court further explained that lack of clarity in the law should be resolved in a defendant's favor.

The court pointed out that the law relating to S corporations repeatedly refers to shareholders and rejected the government's argument that "de facto shareholder" or "ownership interest" was congruent with "shareholder." The court concluded that the government had not shown that Pirro was required to report the Chairman's ownership interest in Properties under the relevant provisions of Subchapter S.

I.

As a threshold issue we must consider whether we have jurisdiction over the appeal of an order dismissing a portion of a count. In *Sanabria v. United States,* 437 U.S. 54, 69 n. 23, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978), the Supreme Court stated that there is no statutory barrier to such an appeal. Statutory authority permits a government appeal from an order of a district court dismissing any one or more counts of an indictment. *See* 18 U.S.C. § 3731 (1994). In *United States v. Tom,* 787 F.2d 65, 71 (2d Cir.1986), we pointed out that our circuit interprets this authority to allow an appeal of a dismissal of an allegation that could have provided a discrete basis for a conviction. We reviewed dismissals of portions of counts in *United States v. Margiotta,* 646 F.2d 729 (2d Cir. 1981), and *United States v. Alberti,* 568 F.2d 617 (2d Cir.1977).[5]

---

4.  Subpart (1) alleged that Pirro disguised personal expenses as business expenses and deducted rental real estate expenses that he knew were not legitimate on the 1992 tax return for Properties.

5.  A number of decisions from other circuits agree that a dismissal of a portion of a count is appealable. *See, e.g., United States v. Serafini,* 167 F.3d 812, 814–16 (3d Cir.1999); *United States v. Bloom,* 149 F.3d 649, 652–54 (7th Cir.1998); *United States v. Oakar,* 111 F.3d 146, 149–150 (D.C.Cir.1997).

■ Here, the district court dismissed only subpart (2) of paragraph 56. Pirro's alleged failure to report the ownership interest of the Chairman (and the other related allegations of subpart (2), see note 6, *infra*) is completely different from the crimes alleged in the other counts of the indictment and the allegations of subpart (1) of Count 67. Subpart (2) provides a discrete basis for conviction. Accordingly, it falls within the rulings of *Margiotta* and *Alberti*. The dismissal of these allegations is thus appealable.

## II.

Pirro contends that the portion of the indictment he challenges fails to allege a crime because it states only that the Hospital Chairman had an "ownership interest" in Properties, which does not necessarily mean that he was a shareholder. Pirro argues that only those deemed "shareholders" have to be reported as shareholders, and that failure to name a non-shareholder in a tax return is not a falsehood.

■ The indictment in this case alleged a violation of 26 U.S.C. § 7206(1), which makes it a crime to

willfully [make and subscribe] any return, statement, or other document which contains or is verified by a written declaration that it is made under the penalties of perjury, and which [the maker] does not believe to be true and correct as to every material matter.

Thus, the elements of a section 7206(1) violation are:

(1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalty of perjury. A false statement is "material" when it has "the potential for hindering the IRS's efforts to monitor and verify the tax liability" of the corporation and the taxpayer.

*United States v. Peters*, 153 F.3d 445, 461 (7th Cir.1998) (citations omitted), *cert. denied*, 525 U.S. 1070, 119 S.Ct. 801, 142 L.Ed.2d 663 (1999); *see United States v. Scholl*, 166 F.3d 964, 979–80 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 176, 145 L.Ed.2d 149 (1999).

■ The false statement alleged in the challenged portion of Count 67 is that, in filing the 1992 tax return for Properties, Pirro "failed to report thereon the hospital Chairman's ownership interest in [Properties]." [6]

The indictment alleges Pirro filed a Form 1120–S (U.S. Income Tax Return for an S corporation) for Properties without including a Schedule K–1 for the Chairman. Schedule K–1, which is attached to Form 1120–S, is entitled "Shareholder's Share of Income, Credits, Deductions, etc." and requires the shareholder's identifying number, shareholder's name and address, and shareholder's percentage of stock ownership for the tax year. Pirro executed two Schedules K–1 that were attached to the 1992 tax return for Proper-

---

6. Count 67, subpart (2) actually contains three allegations: that Pirro "failed to report [on the Properties Form 1120–S] the hospital Chairman's ownership interest in [Properties], misstated thereon ALBERT J. PIRRO, JR.'s ownership interest in [Properties], and failed to reflect thereon all of the payments [Properties] had made, through [Messenger] to the hospital Chairman's wholly owned company." The district court did not consider these latter two allegations separately from the allegation about failing to disclose the

Chairman's interest. On appeal, the government argues in a footnote that failure to disclose the payments to the Chairman is "an entirely discrete basis for criminal liability." This one-sentence footnote is insufficient to preserve the issue for appeal. *See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38, 47 (2d Cir.1999); *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

ties. One identified him as a shareholder owning 90% of the stock, and the other identified Paul J. Monsell as a shareholder owning 10%. The tax code requires that the return of an S corporation include "the names and addresses of all persons owning stock in the corporation ... [and] the number of shares of stock owned by each shareholder...." 26 U.S.C. § 6037(a) (Supp. V 1987). Other than shareholder, no other ownership interests of any kind are required to be listed on the Schedule K–1, and Pirro did not purport to list any other interests.

The applicable statutes and regulations, as well as the forms required to be filed thereunder, refer only to shareholders and stock. The statutes relating to S corporations specifically refer on numerous occasions to shareholders and to holding stock in the corporation. *See, e.g.,* 26 U.S.C. § 1361(b)(1) (1982) (S corporation cannot "have more than 35 shareholders," "have as a shareholder a person ... who is not an individual," "have a nonresident alien as a shareholder," or "have more than 1 class of stock"); 26 U.S.C. § 1362(a)(2) (1982) (entitled "All shareholders must consent to election"); 26 U.S.C. § 1366 (1982) (entitled "Pass-thru of items to shareholders"); 26 U.S.C. § 6037 (see discussion in previous paragraph). In addition, the relevant regulation refers only to stock and shareholders. *See* 26 C.F.R. § 1.6037–1(a) (1992) (tax return for S corporation shall include "[t]he names and addresses of all persons owning stock in the corporation" along with "[t]he number of shares of stock owned by each shareholder"). Finally, the Schedule K–1 on which the allegations are based refers only to shareholder and stock ownership.

### ·A.

■ The government and Pirro battle over whether there is a known legal duty

for Pirro to declare the alleged "ownership interest" of the Chairman.[7] Pirro argues that there was no legal obligation requiring S corporations to report as shareholders on their tax returns holders of unspecified "ownership interests." The district court held that a perusal of the code and regulations did not compel the conclusion that "ownership interest" was congruent with "shareholder." The district court further stated that there was nothing in the indictment, responses to request for particulars, or in the government's response to the motion to dismiss alleging that the Chairman ever elected to become a shareholder of Properties. Accordingly, the court held that Pirro could not be said to have violated a known legal duty imposed by the tax code and regulations in failing to reflect the Chairman's "ownership interest" on the 1992 return.

Indeed, the government has conceded that there was no statute or regulation that specifically stated that S corporations were required to report "ownership interests" on their corporate tax returns, nor has it provided Second Circuit or Supreme Court authority that so states.

This court has held in *United States v. Regan,* 937 F.2d 823 (2d Cir.1991):

> One of the most esoteric areas of the law is that of federal taxation. It is replete with "full-grown intricacies", and it is rare that a "simple, direct statement of the law can be made without caveat." 1 *Mertens Law of Federal Income Tax* § 1.01.... [P]roof of guilt in such cases must be predicated upon a voluntary, intentional violation of a known legal duty.

*Id.* at 827 (citations and internal quotations omitted); *see also United States v. Bok,* 156 F.3d 157, 165 (2d Cir.1998) ("[W]illfulness under the tax laws requires a voluntary, intentional violation of a known legal duty.") (citation and internal quotations

---

7. Judge Katzmann concurs in the judgment based on Section II.A of this opinion, that Subchapter S corporations had no known legal duty to report "ownership interests" because there were no statutes, regulations, or dispositive case law stating that S corporations were required to report such interests.

omitted). While these cases refer to proof at trial, this principle has application as well to an indictment, where criminal liability for perjury turns on an underlying violation of tax law.

The tax law provided Pirro no notice that failure to report an "ownership interest" was criminal. In *United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir.1991), the Seventh Circuit held that an indictment must be dismissed where "current law on the tax treatment of payments to mistresses provided Harris no fair warning that her conduct was criminal," and because "new points of tax law may not be the basis of criminal convictions." The court referred to a civil case discussing the distinction between income and gifts, and stated:

> [C]riminal prosecutions are a different story. These must rest on a violation of a clear rule of law.... If "defendants [in a tax case] ... could not have ascertained the legal standards applicable to their conduct, criminal proceedings may not be used to define and punish an alleged failure to conform to those standards." *United States v. Mallas*, 762 F.2d 361, 361 (4th Cir.1985).

*Id.*

Similarly in *Mallas*, the Fourth Circuit reversed the defendants' convictions for tax evasion that arose out of a tax shelter program because they rested "on an unsubstantiated theory of tax law." 762 F.2d at 363. The court stated:

> "It is settled," this court observed in the analogous criminal tax case of *United States v. Critzer*, "that where the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." 498 F.2d 1160, 1162 (4th Cir.1974). Criminal prosecution for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal.

*Id.* Because only willful conduct is criminal under section 7206 and because willfulness requires a voluntary intentional violation of a known duty, "the duty involved must be knowable." *Id.*

The government contends that numerous civil cases establish that beneficial or de facto ownership controls for tax purposes, citing *Cabintaxi Corp. v. Commissioner*, 63 F.3d 614 (7th Cir.1995), *Wilson v. Commissioner*, 560 F.2d 687 (5th Cir. 1977), *Kean v. Commissioner*, 469 F.2d 1183 (9th Cir.1972), and *Hoffman v. Commissioner*, 47 T.C. 218, 1966 WL 1116 (1966). It is significant that the indictment alleged that the Chairman had an ownership interest, a term that obviously includes interests that Pirro would have had no duty to report, but did not allege that he was a beneficial owner or a de facto shareholder.

The government also relies on *United States v. Biaggi*, 909 F.2d 662, 680–81 (2d Cir.1990), and *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 94–95 (2d Cir.1983), to establish that Pirro violated the law by not reporting the Chairman's interest in Properties. Both cases, however, are distinguishable as neither addressed the duty of a defendant to report another's alleged ownership interest in an S corporation.

We conclude that the indictment does not charge a violation of a known legal duty.

### B.

Pirro also argues that the indictment fails to allege the essential facts constituting the offense charged. A criminal defendant is entitled to an indictment that states the essential elements of the charge against him. *See Jones v. United States*, 526 U.S. 227, 232, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to

plead an acquittal or conviction in bar of future prosecutions for the same offense."); Fed.R.Crim.P.7(c). An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments. *See Russell v. United States,* 369 U.S. 749, 760–61, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

The Fifth Amendment guarantees that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, *see Russell,* 369 U.S. at 770, 82 S.Ct. 1038; *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir. 1999), or that the grand jury acted properly in indicting him. *See Russell,* 369 U.S. at 768–69, 82 S.Ct. 1038 (An important corollary purpose of requirement that indictment state elements of offense is to allow court to evaluate whether facts alleged could support conviction.) *See generally United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir.1995) (pleading requirement at common law was "security against the arbitrary multiplication of offenses"); 2 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 19.2 at 436, 448–49 (1984) ("[T]he requirement that the offense be stated . . . specifying in detail each element of the crime, was seen as providing assurance both that the grand jury understood what was necessary to establish an offense and that the courts did not engage in unanticipated extensions of the substance of the offense."). "The Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Walsh,* 194 F.3d at 44 (internal quotations omitted). As the Supreme Court stated in *Russell:*

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

369 U.S. at 770, 82 S.Ct. 1038.

The Sixth Amendment guaranty of the defendant's right "to be informed of the nature and cause of the accusation" against him is also offended by an indictment that does not state the essential elements of the crime. *Russell,* 369 U.S. at 761, 82 S.Ct. 1038; *see also Walsh,* 194 F.3d at 44.

Because the requirement of a sufficient indictment serves these important purposes, the indictment must be considered as it was actually drawn, not as it might have been drawn. *See Sanabria v. United States,* 437 U.S. 54, 65–66, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) ("The precise manner in which an indictment is drawn cannot be ignored . . . ."). The sufficiency of the indictment is a matter of law that is reviewed de novo. *See United States v. Velastegui,* 199 F.3d 590, 593 (2d Cir.1999). The timing of the defendant's objection is important to the level of scrutiny employed; a defendant who objects to the indictment before trial, as Pirro has done, is entitled to a more exacting review of the indictment than one who waits until after trial to object. *See United States v. Goodwin,* 141 F.3d 394, 401 (2d Cir.1997); *Wydermyer,* 51 F.3d at 324–25.

Under modern pleading rules, "we have consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Walsh,* 194 F.3d at 44 (quoting *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.1975)). The Supreme Court,

however, has recognized a limitation on this practice, so that

"where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." *United States v. Cruik-shank,* 92 U.S. 542, 23 L.Ed. 588 [1875].... "Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *United States v. Hess,* 124 U.S. 483, 487, 31 L.Ed. 516 [1888].

*Russell,* 369 U.S. at 765, 82 S.Ct. 1038. For instance, in *Russell* the defendants were charged with refusing to answer a question pertinent to the subject under inquiry before a congressional subcommittee, but the indictments did not say what the subject under inquiry was. The indictments neither notified the defendants of the gist of the charges against them, nor allowed the court to ascertain that the charges were legally valid. *Id.* at 767–69, 82 S.Ct. 1038. The Supreme Court therefore reversed the convictions based on the defective indictment. *Id.* at 755, 82 S.Ct. 1038. Under the same principle, where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense. *See* LaFave, *supra,* at 452; 1 Charles Alan Wright, *Federal Practice and Procedure: Criminal 3d* § 124 at 549 (1999). Similarly, when "one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United*

States v. Foley, 73 F.3d 484, 488 (2d Cir. 1996), *abrogated on other grounds, United States v. Santopietro,* 166 F.3d 88, 92–93 (2d Cir.1999). In sum, for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime.

The indictment failed to sufficiently allege the second element of a section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood. In this case, the allegation is that Pirro omitted something from a tax return. An omission cannot amount to a false statement, which is an essential element of a section 7206(1) violation, without the crucial background fact that gives rise to the duty to disclose the fact that was omitted. Only the omission of facts required to be reported constitutes a material falsehood. The indictment must therefore allege what made the omission in this case criminal.

And indeed the government purports to identify the respect in which the return as filed was incorrect; the problem is that the government's allegation might or might not make the return incorrect, and in violation of section 7206(1). It alleged that the Chairman had an "ownership interest" in Properties when in fact, "ownership interest" is a broader category than "share ownership." The government seemingly admits that "ownership interest" is not specific by persisting in using, in its briefs and at argument, the terms beneficial or de facto ownership of shares as opposed to the indictment's term "ownership interest."[8] The most that omitting a Schedule K–1 could be said to imply is that there were no other shareholders in Properties besides Pirro and Monsell. This would be

---

8. The indictment in paragraphs 52 and 53 alleges the payments from Properties to Messenger and from Messenger to the Chairman's wholly-owned company. There is no allegation, however, as to how these payments create an ownership interest.

a misstatement if in fact there were other shareholders. However, the indictment itself does not allege that the Chairman was a shareholder, in those words or any other words legally equivalent. Instead, it refers to the Chairman as having an "ownership interest" in Properties.

Here, the allegation is that the "ownership interest" of the Chairman was not reported. "Ownership interest" is a generic term that does not descend to particulars. *Cf. Russell,* 369 U.S. at 765, 82 S.Ct. 1038. The government strongly argues that the Chairman was a de facto shareholder, held a beneficial interest or that Pirro was a nominee, but the indictment did not use those particular terms.

The government's use of the term "ownership interest" rather than "stock ownership" was not inadvertent, since the government chose not to respond meaningfully to Pirro's request for a more specific description. Following up to his request for a bill of particulars, Pirro specifically requested that the government:

> Identify the nature of the "ownership interest" allegedly acquired by the hospital Chairman in [Properties], including (a) the date such an interest was acquired, (b) any consideration paid by the hospital Chairman to acquire this interest, (c) any documents evidencing the hospital Chairman's ownership of such an interest, and (d) and statute, regulation or other authority supporting the allegation that the hospital Chairman acquired an "ownership interest" in [Properties].

In light of the government's statement that the Chairman's interest should have been disclosed on a Schedule K–1, Pirro also requested it to "identify (a) the page and line reference of a Schedule K–1 where such interest should have been so reflected; and (b) the statute, regulation, or other tax authority requiring the disclosure of such alleged interest on a Schedule K–1." The government chose not to specify the nature of the Chairman's alleged interest, but instead answered the first request by saying that if the information could not be gleaned from the indictment, discovery materials, and the particulars already provided, it was "not properly the subject of a bill of particulars." In response to Pirro's request regarding the K–1, the government stated that "a Schedule K–1 should have been filled out in its entirety for the hospital Chairman" and that the authority requiring the disclosure was not a proper subject of a bill of particulars.

Thereafter, Pirro filed a motion to strike the allegations because they did not state a violation of section 7206(1). In defending against the motion to strike, the government argued that "beneficial" or "de facto" ownership controls for tax purposes rather than defending the actual words it used in the indictment. In briefing the case before this court, the government referred to Pirro as a "nominee" for the first time.[9] It is also evident that the government has made use of "shareholder" and "share ownership" not only in the statement of issues, but substantially throughout its brief. *Cf. Russell,* 369 U.S. at 768, 82 S.Ct. 1038 ("At every stage in the ensuing criminal proceeding [the defendant] was met with a different theory, or by no theory at all, as to what the topic [under inquiry] had been.").

The government argues that the court should infer "shareholder interest" from the more general term "ownership interest." This argument is rejected. This

---

**9.** In contrast to Subchapter S's focus on shareholders, the tax law regarding partnerships refers to "nominees" of partnership interests. A partnership that is required to file a tax return must furnish "each person who is a partner or who holds an interest in such partnership as a nominee for another person" with a copy of the information required on the return. 26 U.S.C. § 6031(b) (Supp. V 1987). Further, the nominee must give the partnership the name and address of the person for whom he or she holds the interest and give that person the information regarding the partnership's return. *See* 26 U.S.C. § 6031(c) (Supp. V 1987).

court faced an indictment with the same kind of defect in *United States v. Berlin,* 472 F.2d 1002, 1008 (2d Cir.1973). There, the defendant was charged with aiding and abetting another in submitting false documents to a savings and loan. An essential element of the crime was knowledge of the falsity of the documents, but there was no allegation of knowledge, only that the defendant "counseled and caused" the other person to submit the documents. The government argued that the indictment was good enough because "counseled and caused" meant about the same thing as knowledge. *Id.* at 1007. This court rejected the government's argument:

> With this argument we cannot agree. One can counsel and cause another to utter a statement that one only later learns to be untrue. Therefore, Berlin's knowledge of the falsity at the time he caused the statements to be made is not necessarily implied from the allegation that he "counseled and caused" the statements to be made.

*Id.* at 1007–08. We reversed the conviction based on the inadequate indictment. *Id.* at 1010. *Accord United States v. Morrison,* 536 F.2d 286, 289 (9th Cir.1976) (allegation that defendant "converted" property not sufficient to allege theft, since conversion may or may not involve intent).

The indictment alleges the omission of a fact that Pirro might not have been required to report. When alerted to this, the government failed to take advantage of the request for a bill of particulars to make the general term "ownership interest" more specific and legally sufficient.[10] Count 67, subpart (2) of paragraph 56 failed to state the essential element of a material misrepresentation. Accordingly, Pirro was not adequately informed of the nature of the accusation against him, as is his right under the Sixth Amendment.

For the same reasons, the grand jury may not have understood the elements of the crime and the evidence necessary to support the indictment, as required by the Fifth Amendment.

We affirm the judgment of the district court dismissing subpart (2) of paragraph 56 in Count 67 of the indictment.

McLAUGHLIN, Circuit Judge, dissenting:

I respectfully dissent. In my view, the indictment in this case is not only constitutionally sufficient, it alleges a violation of a known legal duty. No more is required by 26 U.S.C. § 7206(1).

## THE FACTS

I begin by recounting in full the factual theory offered by the government in support of the stricken allegations (which the parties refer to as "the Boyle Allegations"). It bears emphasis that for purposes of this appeal, "the facts alleged by the government must be taken as true." *United States v. Velastegui,* 199 F.3d 590, 592 n. 2 (2d Cir.1999) (citing *United States v. Rosengarten,* 857 F.2d 76, 78 (2d Cir. 1988)).

The government alleges that from 1991 to 1993, Robert Boyle was the chairman of Hudson Valley Hospital Center ("HVHC"), a small community hospital in Peekskill, New York. He was also a director of HVHC's parent corporation, Westchester–Putnam Health Management Services, Inc. ("WPHMS"). In early 1991, Boyle called an abandoned commercial office building (suitable for doctors' offices) in Croton, New York to the attention of defendant attorney Albert Pirro. According to the government, Pirro and Boyle then hatched a scheme to use the abandoned Croton building as a vehicle through which they

---

10. This is not to suggest that a bill of particulars could have saved an otherwise defective indictment. *See Russell,* 369 U.S. at 770, 82 S.Ct. 1038 ("[I]t is a settled rule that a bill of particulars cannot save an invalid indict-ment."). The government had notice of Pirro's objection to the challenged portion of the indictment, and could have, but did not, file a superseding indictment.

could exploit Boyle's status as a director and chairman to misappropriate money from WPHMS and its subsidiaries. Pirro would buy the office building, and then with Boyle's help would lease it to a subsidiary of WPHMS. WPHMS would then pay for the building's renovation, and the pair would ultimately sell it for a substantial profit. Under the government's theory, Pirro and Boyle agreed to share their profits from this scheme on a 50–50 basis.

As the first step in the plan, Pirro set up Distinctive Properties of Croton, Inc. ("DPC") as an S Corporation. DPC's original Shareholders' Agreement lists Pirro as its 90% owner, with the other 10% being owned by his law partner, Paul Monsell. In February 1991, about two-and-a half months before DPC even bought the Croton building, DPC leased the building to Hudson Valley Ventures, Inc. ("HVV"), a subsidiary set up by Boyle's employer WPHMS.

The pair had to figure out a way to pay Boyle without calling attention to the fleecing he was giving his employers. Two documents in the record add some mystery to the arrangements.

The first is an agreement dated April 3, 1991, in which DPC granted to one of Boyle's wholly owned companies—Westchester Concrete, Inc.—an option to acquire 45% of DPC's shares for $10. The Westchester Concrete company was no more than a cat's-paw for Boyle: the $10 option would exist only as long as Boyle owned 100% of Westchester Concrete. In addition, the agreement proclaimed that DPC granted the option because "ROBERT BOYLE, on behalf of Westchester Concrete, Inc. did find and otherwise organize the overall transaction including the lease with Peekskill Community Hospital and its various entities." The agreement provided that Boyle had to exercise the option within 30 days of DPC's purchase of the Croton office building, otherwise the option would expire.

The second document is a revised DPC "Shareholders' Agreement" dated March 1991. This new Shareholders' Agreement lists Messrs. Pirro, Boyle and Monsell as DPC's shareholders, and declares that Monsell would own 10% of DPC's shares, and that Pirro and Boyle would each own 45%. The Agreement includes, however, a "condition precedent" requiring Boyle to obtain a written resolution of the Board of Directors of WPHMS consenting to his acquisition of the DPC shares. The Agreement is signed and executed by Boyle as well as by Pirro and Monsell.

On this undeveloped record, the purpose of these two documents remains obscure. Perhaps Pirro and Boyle actually thought at one point that WPHMS would consent to Boyle's acquiring an ownership interest in DPC. Or perhaps the pair never intended to seek the requisite consent from WPHMS at all, but instead, as the government contends, created these documents as a mere sham to cloak their arrangement in some semblance of legitimacy. Whatever the case, it is undisputed that when DPC purchased the Croton building for $950,000 on April 19, 1991, Boyle did not exercise his putative $10 option to formally purchase a 45% ownership interest in DPC.

It is also clear that Boyle never publicly signed on as a shareholder of record in DPC. The government alleges, however, that, despite the lack of a paper trail, Boyle in fact became the beneficial owner of 45% of DPC's shares, and that Pirro, acting as his straw man nominee, distributed the corporation's profits accordingly. For example, from 1991 to 1993, DPC received rental payments from HVV for the lease of the Croton building. During the entire period of the leasehold, as these payments came in from HVV, DPC made a series of payments to another of Pirro's companies, PM Messenger, Inc. ("PMM"). PMM then made payments in precisely the same amounts to Rogene Industries, Inc., a company wholly owned by Boyle. The total amount funneled to Boyle in this fashion was $135,726.70. Then in 1993,

two days after DPC sold the building outright to its tenant, HVV, for $1.5 million, yet another of Pirro's companies, AJP Management Group, Inc., paid Rogerie $156,572.57. The government alleges that the total payments funneled by DPC to Boyle amounted to almost exactly 45% of the monies derived from the purchase, renovation, leasing and sale of the Croton building.

In early 1993, Pirro had to file DPC's tax return for the 1992 year. The statute requiring Pirro to file a tax return for DPC as a Subchapter S Corporation was (and still is) 26 U.S.C. § 6037(a). That statute provides in pertinent part:

> Every S Corporation shall make a return for each taxable year, stating specifically ... the names and addresses of all persons owning stock in the corporation at any time during the taxable year, the number of shares of stock owned by each shareholder at all times during the taxable year, [and] the amount of money and other property distributed by the corporation during the taxable year to each shareholder....

26 U.S.C. § 6037(a).

To comply with § 6037(a), an S Corporation must file its income tax return on Form 1120–S entitled "U.S. Income Tax Return for an S Corporation." Among the obligatory attachments to Form 1120–S are various schedules calling for such information as the S Corporation's net income, expenses and losses. In addition, the S Corporation must attach to its Form 1120–S a Schedule K–1 for each shareholder setting forth the "Shareholders' Shares of Income, Credits, Deductions, Etc." On the first page of Form 1120–S is the IRS's standard warning: "Under penalties of perjury, I declare that I have examined this return, including accompanying sched-

ules and statements, and to the best of my knowledge and belief, it is true, correct, and complete." An officer of the Corporation must sign the form.

As company president, Pirro signed DPC's Form 1120–S for the 1992 year. Notwithstanding Boyle's 45% ownership interest, Pirro filled out the return as if he, Pirro, owned 90% of DPC. No Schedule K–1 was attached for Boyle. And on line 20 of Pirro's Schedule K–1 which calls for "Shareholder's percentage of stock ownership for tax year," Pirro entered "90%". The return also set forth DPC's financial results for 1992. In addition to such things as depreciation and assets, DPC's net income from real estate activities is listed. Correspondingly, Pirro's Schedule K–1 also set forth his 90% share of DPC's net income from real estate activities, as well as the gross income and net expense figures used to calculate that share.

The indictment charges Pirro with violating 26 U.S.C. § 7206(1), which makes it a felony for "any person ... [to][w]illfully make[ ] and subscribe[ ] any return ... which he does not believe to be true and correct as to every material matter." The Boyle Allegations actually charge three discrete bases for criminal liability under § 7206(1):

First, they allege that Pirro "failed to report [on DPC's 1992 return, Boyle's] ownership interest in DPC."

Second, that Pirro "misstated thereon [his own] ownership interest in DPC."

Third, that Pirro "failed to reflect thereon all of the payments DPC had made, through PMM, to [Boyle's] wholly owned company."[1]

---

1. This third Boyle Allegation appears to have nothing to do with whether Pirro's concealment of Boyle's ownership interest in DPC constitutes a crime. Instead, the third charge can be read to allege that various of the financial numbers set forth on DPC's 1992 return (such as net income from real estate activities) are misstated, simply because they omit the payments DPC made to Boyle through PMM. As such, the third charge pleads an independent basis for criminal liability. *See, e.g., United States v. Bok,* 156 F.3d 157, 166 (2d Cir.1998) (affirming § 7206(1) conviction for understating gross receipts). I

## DISCUSSION

### I. *Perceived Constitutional Flaws*

Judge Gibson homes in on the indictment's use of the term "ownership interest" to describe beneficial share ownership. He concludes that the indictment is constitutionally flawed because, by employing the term "ownership interest" it failed to: (1) put Pirro on notice of the charged crime as required by the Sixth Amendment; and (2) give the grand jury an understanding of what was necessary to establish the elements of that crime as required by the Fifth Amendment. *See ante* at 95. I disagree with both conclusions.

### A. *Sixth Amendment: Clarity of the Indictment*

A defendant unquestionably enjoys the right to "be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. All that is necessary to satisfy this constitutional mandate is that the indictment "inform[ ] the defendant of the offense charged with sufficient clarity so that he will not be misled while preparing his defense." *United States v. Brozyna,* 571 F.2d 742, 746 (2d Cir.1978) (internal quotation marks omitted); *see United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998) (same). The Sixth Amendment's notice protection is implemented by the requirement of Rule 7(c)(1) that an indictment contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R.Crim. Pro. 7(c); *see United States v. Walsh,* 194 F.3d 37, 44 (2d Cir.1999).

Here, the indictment satisfies these requirements. To be sure, the indictment does not use the label "beneficial shareholder" to describe Boyle, nor, for that matter, use the term "nominee" to describe Pirro. Nevertheless, the indictment: (1) describes in detail the evolution of Pirro's and Boyle's scheme, including

the specific facts that led to Boyle's acquisition of "a 45% ownership interest" in DPC; and (2) notifies Pirro that this conduct allegedly violated § 7206(1).

Under any man-in-the-street reading, the language "45% ownership interest" is sufficiently specific to apprise Pirro that he is being charged with a violation of § 7206(1) based on the concealment of Boyle's 45% ownership of DPC. Indeed, the defendant implicitly concedes that he had sufficient notice of the crime charged to allow him to prepare a defense. His brief on this appeal advances no real complaint that he was deprived of constitutional notice. And his *successful* Rule 12 motion in the district court did not argue for dismissal based on failure of notice, but rather on the weightier objection that there is no legal duty to fill out a Schedule K–1 for a person who enjoys only "quasi-shareholder status." Finally, the district court did not even base its dismissal on failure of notice. Instead, as Judge Gibson concedes, the district court dismissed the Boyle Allegations because it concluded that a legal obligation to include an individual with an ownership interest on an S Corporation's tax return is "debatable." *Ante* at 88.

In these circumstances, *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), is totally unhelpful to Pirro. The *Russell* court did indeed hold that an indictment which "failed to sufficiently apprise the defendant [of the crime charged]" was inadequate. *See* 369 U.S. at 764, 82 S.Ct. 1038. But the Court did so in unique circumstances which have been distinguished numerous times by this and other courts, *see, e.g., Walsh,* 194 F.3d at 45; *United States v. McClean,* 528 F.2d 1250, 1257 (2d Cir.1976); *United States v. Paulino,* 935 F.2d 739, 750 n. 4 (6th Cir. 1991) (collecting cases), and which bear little relationship to the issues confronting us today.

agree with Judge Gibson, however, that the government has failed to preserve this issue

for appeal. *See ante* at 88 n. 5. Accordingly, I join footnote 5 of Judge Gibson's opinion.

In *Russell,* the Court condemned indictments that alleged refusal to answer questions posed by the House Committee on Un–American Activities. This refusal, the indictment charged, violated 2 U.S.C. § 192 which made it a misdemeanor to "refuse[ ] to answer any question pertinent to the question under inquiry." The Court held that the defendants could not be guilty under § 192 "unless the questions [they] refused to answer were in fact pertinent to a specific topic under [congressional] inquiry." 369 U.S. at 768, 82 S.Ct. 1038. Crucially, however, the indictment failed to specify even the subject matter under congressional inquiry. Thus, the *Russell* defendants faced trial with the "chief issue undefined." *Id.* at 766, 82 S.Ct. 1038.

Here, there are no such problems. We all know what the issues are. As has already been made apparent, the Pirro indictment includes "such a statement of facts and circumstances" as to "descend to particulars." *Id.* at 765, 82 S.Ct. 1038. Unlike the "cryptic" indictments in *Russell,* the indictment here charges that Pirro "failed to report [on the 1992 return] the hospital Chairman's ownership interest in DPC," and "misstated thereon" his own "ownership interest in DPC, and failed to reflect thereon all of the payments DPC had made, through PMM, to the hospital Chairman's wholly owned company." In my view, this Circuit's case law simply does not require the government to "descend" into any greater particularity.[2]

In sum, by relying on the notice requirements of the Sixth Amendment, Judge Gibson rests on a theory that: (a) has never been argued by the defendant; (b) was not relied on by the district court; and

(c) demands a level of specificity beyond what the Constitution requires.

B. *The Fifth-Amendment: The Grand Jury Issue*

The grand jury clause of the Fifth Amendment is similarly irrelevant to this appeal. That clause prohibits prosecution for charges not presented to the grand jury. *See Walsh,* 194 F.3d at 44. All that is required to satisfy the clause is that the indictment contain "some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Id.* (citations omitted).

Judge Gibson notes that it was only after the indictment was returned, that the government specified that Boyle, as the holder of a "45% ownership interest," was a "45% beneficial shareholder" of DPC. The suggestion is that the government's post-indictment refusal to adhere slavishly to the "45% ownership interest" language already appearing in the indictment somehow constitutes an impermissible modification of the essential elements of the § 7206(1) charge presented to the grand jury. I cannot agree.

In my view, this is hardly a case where "[a]t every stage . . . the defendant [is] met with a different theory." *Russell,* 369 U.S. at 768, 82 S.Ct. 1038. To the contrary, it strikes me that the government's theory here has remained absolutely constant. Simply put, the Boyle Allegations charge that Pirro violated § 7206(1) by lying on his tax returns about Boyle's ownership of 45% of DPC. To the extent that the government's change in nomenclature from "45% ownership interest" to "45% beneficial shareholder" has any significance, "it simply adds detail," and indeed

---

**2.** But even if Judge Gibson's heightened standards are applied, the government complied with them by responding to Pirro's request for a bill of particulars. In that response, the government specified that "a Schedule K–1 should have been filled out in its entirety" for Boyle. The significance of this disclosure must have been self-evident: Schedule K–1s

are filled out by the *"shareholders"* of an S Corporation. Nevertheless, Judge Gibson faults the government for "choos[ing] not to specify the nature of [Boyle's] alleged [ownership] interest" in DPC in its response to Pirro's request for a bill of particulars. *Ante* at 94.

"narrows rather than broadens" the original charges. *United States v. Zvi*, 168 F.3d 49, 54 (2d Cir.1999). As such, it was entirely permissible. *See e.g., United States v. Miller*, 471 U.S. 130, 145, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *see also United States v. Castro*, 776 F.2d 1118, 1123 (3d Cir.1985) (no violation of Fifth Amendment where "variation did not broaden the bases for conviction, but instead narrowed the scope of the evidence to prove an offense included in the indictment.").

Although this Circuit long ago abandoned "technical rigidity in reviewing indictments," *United States v. Wydermyer*, 51 F.3d 319, 324 (2d Cir.1995), Judge Gibson also seeks to support his Fifth Amendment theory by engrafting an additional layer of complexity onto our indictment jurisprudence. He concludes that the indictment was defective because it fails to explicitly specify the legal duty which made Pirro's lies about Boyle a crime under § 7206(1). *See ante* at 92–93. Such specificity was required, Judge Gibson maintains, because of the "principle" that "where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense." *Id.*

This has never been the law in this Circuit. To the contrary, "we have consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Walsh*, 194 F.3d at 44 (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.1975)); *see United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir.1998); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.1992).

These requirements were more than satisfied by Pirro's indictment. Indeed, this is not a case like *United States v. Berlin*, 472 F.2d 1002, 1006 (2d Cir.1973) in which the government actually omitted a requisite element of the charged offense from the indictment presented to the grand

jury. No such omission occurred here. To the contrary, the indictment alleges each essential element of a § 7206(1) violation—charging that Pirro "willfully and knowingly" filed a "false" tax return that "he did not believe to be true and correct as to every material matter." *See United States v. Peters*, 153 F.3d 445, 461 (7th Cir.1998) (listing elements of a § 7206(1) violation). More than that, the indictment specifies that Pirro violated § 7206(1) by concealing Boyle's "45% ownership interest" in DPC. Under our case law, this was all that was necessary. *See Walsh*, 194 F.3d at 44; *Alfonso*, 143 F.3d at 776; *Stavroulakis*, 952 F.2d at 693.

In sum, both my colleagues may legitimately question whether Pirro's failure to mention in DPC's tax return Boyle's real ownership of DPC constitutes a crime. This is a fair question that turns on whether Pirro had a known legal duty to disclose Boyle's beneficial shareholding in DPC. The question of whether there is a known legal duty, however, is one of law for the court, not the grand jury, to resolve. *See United States v. Ingredient Technology Corp.*, 698 F.2d 88, 97 (2d Cir.1983). Whatever the answer to that question, there can be no doubt that the § 7206(1) charge itself was fairly presented to the grand jury.

## II. *Is It a Crime?*

I turn, at last, to what I regard as the only colorable issue in this case. The Boyle Allegations purport to charge a violation of § 7206(1). That statute requires the government to prove that the defendant acted "willfully" in filing materially false tax returns. Relying on the due process clause, "the Supreme Court has made clear that in order to avoid snaring people in the tangled net of the tax code solely due to their incompetence, willfulness under the tax laws requires 'a voluntary, intentional violation of a known legal duty.'" *United States v. Bok*, 156 F.3d 157, 165 (2d Cir.1998) (quoting *Cheek v.*

*United States,* 498 U.S. 192, 200–01, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)).

Applying these heightened standards, the question presented by this case is a close one—namely, whether there was a known legal duty in 1992 to reflect Boyle as a beneficial owner of DPC's shares on the tax returns required by Subchapter S. My colleagues' answer is no. In my view, the answer to that question should be yes.

### A. *S Corporations*

Subchapter S of the Internal Revenue Code was enacted in 1958 to encourage small businesses to adopt the corporate form. *See Bufferd v. Commissioner,* 506 U.S. 523, 525, 113 S.Ct. 927, 122 L.Ed.2d 306 (1993). The statute accomplishes this goal by means of a pass-through system under which corporate income, losses, deductions, and credits are attributed to the individual shareholders in a manner akin to the tax treatment of partnerships. The tax advantage of an S Corporation is that it avoids the double taxation of corporate earnings to which shareholders of ordinary corporations are subject. *See* 26 U.S.C. §§ 1366–1368. Under the law applicable in 1992, to qualify as an S Corporation, a company must: (1) have no more than 35 shareholders; (2) have only one class of stock with "identical rights to distribution and liquidation proceeds;" and (3) distribute its profits and losses to its shareholders on a *pro rata* basis. *See* 26 U.S.C. §§ 1361(b)(1)(A); 1366(a)(1)(A).

A small business indicates its decision to become an S·Corporation by filing a completed IRS Form 2553. *See* 26 C.F.R. § 1.1362–6(a)(2). An initial election to become an S Corporation is valid "only if all persons who are shareholders ... on the day on which such election is made consent to such an election." 26 U.S.C. § 1362(a)(2). "However, once a valid election is made, new shareholders need not

consent to that election." 26 C.F.R. § 1.1362–6(a)(2).[3]

Every year, an S Corporation must file an informational return, reporting, *inter alia,* its gross income and deductions etc. *See* 26 U.S.C. 6037(a). Those who are the beneficiaries of income from the corporation must then pay taxes on that income on a personal basis, *see* 26 U.S.C. § 1366(c), regardless of whether the income is actually distributed. *See id.; Hume v. Commissioner,* 56 T.C.M. (CCH) 290, 293 (1988), *aff'd.* 899 F.2d 1225 (9th Cir.1990); *see also Knott v. Commissioner,* 62 T.C.M. (CCH) 287 (1991). The fact that undistributed income may be taxed explains the rule requiring unanimous initial consent to an S Corporation election. That rule ensures that no person who is the beneficial recipient of an S Corporation's undistributed income will be forced to report that income involuntarily. *See Kean v. Commissioner,* 469 F.2d 1183, 1186 (9th Cir. 1972).

### B. *The Legal Status of Beneficial Shareholders*

It is a fundamental axiom, applicable even in the criminal context, that tax consequences flow from the substance rather than the form of a transaction, and that "control over property, rather than documentary title" marks the real owner for federal tax purposes. *United States v. Schmidt,* 935 F.2d 1440 (4th Cir.1991) (collecting cases); *see United States v. Atkins,* 869 F.2d 135, 140 (2d Cir.1989); *United States v. Ingredient Technology Corp.,* 698 F.2d 88, 95 (2d Cir.1983). My colleagues suggest that this axiom is inapplicable here. It seems to be their perception that there is no statute which obliged Pirro to report Boyle as a beneficial owner on DPC's returns. I cannot agree.

The majority overlooks 26 U.S.C. § 6037(a), the very statute which required Pirro to file DPC's return in the first

---

**3.** For this reason, the cavil that there is no allegation that Boyle "ever elected to become a shareholder" of DPC is beside the point.

*See ante* at 90. Everyone agrees that Boyle became a shareholder *after* DPC's initial election.

place. As already noted, § 6037(a) imposes its reporting obligations with respect to "all persons owning stock in the corporation," a category it equates with "shareholders." Neither § 6037(a) itself, nor the accompanying regulations and IRS instructions, even suggest that the terms "persons owning stock in the corporation," and "shareholders" are somehow confined to ownership interests that are officially recorded on the corporation's books. And while it is also true that these statutes and regulation did not explicitly state in 1992 that those terms include the beneficial owners of stock, I fail to see why the absence of such an explicit definition should confer a license for the willful concealment alleged here.

The prohibition against vagueness in criminal tax proceedings has never been read to prohibit prosecutions under statutes "which a reviewing court believes could have been drafted with greater precision." *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir.1978). "All the Due Process Clause requires is that the law give sufficient warnings that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Ingredient Technology Corp.*, 698 F.2d at 97 (quoting *Herrera*, 584 F.2d at 1149). Here, Pirro had the requisite fair warning, not only from the text of § 6037(a), but from the case law, a governing revenue ruling, and applicable regulations.

"The issue of shareholder status in Subchapter S corporations is not a new one." *Speca v. Commissioner*, 630 F.2d 554, 556 (7th Cir.1980). As already noted, an initial election to become an S Corporation is valid, "only if all persons who are shareholders ... on the day on which such election is made consent to such an election." 26 U.S.C. § 1362(a)(2). Although the issue of who is a "shareholder" for purposes of determining whether there has

been a valid initial election has been litigated many times, it has been resolved by the courts consistently. Every court that has addressed the issue has concluded that a beneficial shareholder of an S Corporation's stock is indeed that Corporation's shareholder.

The seminal opinion is *Hoffman v. Commissioner*, 47 T.C. 218, 1966 WL 1116 (1966), *aff'd on basis of tax court opinion*, 391 F.2d 930 (5th Cir.1968). In that case, a shareholder in an S Corporation sold her stock to the taxpayer but continued to hold it in escrow (*i.e.*, she remained the shareholder of record) to ensure payment of the purchase price. The purchaser-taxpayer consented to a Subchapter S election, but the former owner and still shareholder of record did not. The Tax Court held that her consent was unnecessary. According to the court, "beneficial ownership of the stock, as opposed to technical legal title thereto," is the "critical" factor in determining who is a "shareholder." Applying this principle, the court then concluded that "regardless of who had naked title, the shares were really owned by [the purchaser-taxpayer] and were merely pledged as collateral." This was so, because it was the purchaser-taxpayer of the Corporation who was to enjoy "all the fruits of the enterprise," whereas the shareholder of record "plainly could not have been taxed" on the Corporation's undistributed earnings. *Id.*, 47 T.C. at 234.

The cases following *Hoffman* are legion. *See e.g., Cabintaxi v. Commissioner*, 63 F.3d 614, 616 (7th Cir.1995) (individuals who are not shareholders of record, are nevertheless "shareholders" for purposes of Subchapter S if they are "beneficial owners" under applicable state law); *Pahl v. Commissioner*, 150 F.3d 1124, 1228–1129 (9th Cir.1998) (lawyer who joined law firm organized as S Corporation but withdrew without paying for shares was properly treated as shareholder for S Corporation tax purposes and thus required to report *pro rata* share of profits because he "held a beneficial shareholder's interest in

the corporation"); *Wilson v. Commissioner*, 560 F.2d 687, 689 (5th Cir.1977) ("[T]he term 'shareholders' must mean those who bear the tax consequences of the election. . . . Because beneficial ownership of stock, not mere record ownership or other formal indicia, determines who bears those tax consequences, beneficial ownership also provides the standard for determining who must consent to the Subchapter S election."); *Kean v. Commissioner*, 469 F.2d 1183, 1189 (9th Cir.1972) (" 'shareholders' who must file a consent are not necessarily 'shareholders of record' but rather beneficial owners of shares who would have to include in gross income dividends distributed with respect to the stock of the corporation"); *Lafayette Dist., Inc. v. United States*, 397 F.Supp. 719, 724 (W.D.La.1975) ("Traditionally, courts have looked to the beneficial owner in order to ascertain who has the tax liability"); *Danenberg v. Commissioner*, 73 T.C. 370, 390, 1979 WL 3864 (1979) ("It is well established that for purposes of determining who is a shareholder under the provisions of subchapter S, beneficial ownership of the stock rather than technical legal title is controlling."); *Ragghianti v. Commissioner*, 71 T.C. 346, 349, 1978 WL 3361 (1978) ("By now it is well settled that record ownership of stock, standing alone, is not determinative in answering the question as to who is required to include in gross income any dividends attributable to such stock. Rather, beneficial ownership is the controlling factor."); *CHM Co. v. Commissioner*, 68 T.C. 31, 37, 1977 WL 3734 (1977) ("in deciding who is a shareholder for subch. S purposes, we look to the beneficial ownership of the stock."); *Hook v. Commissioner*, 58 T.C. 267, 273, 1972 WL 2439 (1972) ("[B]eneficial ownership, as opposed to technical legal title, is determinative. . . .").

Also relying on *Hoffman*, the IRS itself advised as far back as 1970 that:

> [F]or purposes of determining who is a shareholder under the provisions of Subchapter S of the Code, beneficial owner-

ship of the stock rather than technical legal title is controlling. Accordingly, it is held that the taxpayer who is the stockholder of record but does not own the beneficial interest in a share of stock of a small business corporation is not a shareholder for the purposes of the provisions of Subchapter S of the Code. . . .

*IRS Revenue Ruling* 70–615, 1970–2 C.B. 169, 1970 WL 20547 (relying on *Hoffman*, 47 T.C. 218, 1966 WL 1116). In this Circuit, this Revenue Ruling is "entitled to great deference." *Texasgulf, Inc. & Subs. v. Commissioner*, 172 F.3d 209, 217 (2d Cir.1999) (citations omitted). Indeed, it is presumed to " 'have the force of legal precedent unless unreasonable or inconsistent with the provisions of the Internal Revenue Code.' " *Gillespie v. United States*, 23 F.3d 36, 39 (2d Cir.1994) (quoting *Salomon, Inc. v. United States*, 976 F.2d 837, 841 (2d Cir.1992)) (citing *Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1411 (2d Cir.1985)).

The rule that beneficial owners of an S Corporation's stock are its shareholders is obviously neither "unreasonable" nor "inconsistent" with the purposes and provisions of the Tax Code. Indeed, while I am the first to concede that the federal tax laws are often "esoteric," I cannot imagine that reasonable people would really have any difficulty understanding the rule that the beneficial owners of an S Corporation's stock are in fact "persons owning stock in the corporation." 26 U.S.C. § 6037(a).

The rationales for that rule are self-evident. At a threshold level, it prevents an obvious end run around the rule that an S Corporation can have no more than 35 (now 75) shareholders. More fundamentally, it serves the purpose of requiring S Corporations to list for the IRS the actual recipients of beneficial income from the Corporation's shares. In this latter respect, the beneficial ownership rule is entirely consistent "with the basic congressional purpose [in enacting Subchapter S] to tax" only those who actually receive "dividends paid by the corporation."

*Kean,* 469 F.2d at 1186 (quoting *Hoffman,* 47 T.C. at 233).

Finally, for much of the history of Subchapter S, the IRS's regulations have explicitly explained that:

> Ordinarily, the person who would have to include in gross income dividends distributed with respect to the stock of the corporation ... is considered to be the shareholder of the corporation.... For example, ... [t]he person for whom stock of a corporation is held by a nominee, guardian, custodian, or an agent is considered to be the shareholder of the corporation.

26 C.F.R. § 1.1361–1(e) (1995). It is true that this regulation was proposed in 1986, but did not actually get formally adopted until 1995. It is equally true that its predecessor statute— § 1.1371–1(d) containing almost exactly the same language— was withdrawn pursuant to the 1982 Subchapter S Revision Act, *see* Pub.L. 97–364, 96 Stat. 1669 (1982). Nevertheless, I fail to see how the suspension of a regulation, which is obviously merely reflective of (rather than the source for) applicable law, somehow grants taxpayers license to hugger-mugger about the real shareholders of their companies.

. . . . .

In light of the wealth of statutory, decisional and regulatory authority establishing that the beneficial owners of an S Corporation's stock are its shareholders, I am puzzled by my colleagues' reliance on *United States v. Harris,* 942 F.2d 1125 (7th Cir.1991). *Harris* arose from the government's failed efforts to prosecute a mistress for not declaring as income personal gifts from her paramour. Unlike that situation, ours is not a case where neither "regulations," nor "appellate or district court cases ... cover the subject." *Harris,* 942 F.2d at 1132. I am also unsympathetic to the majority's apparent concern that no known criminal prosecution has been premised on the identical theory underlying the Boyle Allegations. While I agree that heightened standards

are applicable in determining whether a duty has been breached in the criminal context, to me "it is immaterial that there is no litigated fact pattern precisely in point." *United States v. Kinzler,* 55 F.3d 70, 74 (2d Cir.1995) (internal quotation marks omitted) (citing cases).

Indeed, this Circuit has allowed tax convictions on the basis of legal duties far less clearly defined than the duty applicable here. In *United States v. Ingredient Technology Corp.,* 698 F.2d 88 (2d Cir. 1983), defendants—the SuCrest Corporation and its former president—filed tax returns for the 1976 year claiming deductions for a large amount of sugar inventory. It turned out that while SuCrest retained legal title to the sugar inventories at all pertinent times, it had resold all beneficial interest in those inventories without reporting the resale on its 1976 return. The defendants were convicted of filing a false return in violation of § 7206(1).

On appeal, they argued that their accounting treatment of the sugar was proper under Treasury Regulation Section 1.471–1, which provided that: (1) "goods sold" the "title to which has passed to the purchaser" should be excluded from inventory; and (2) "[m]erchandise should be included in the inventory only if title thereto is vested in the taxpayer." Relying on these provisions, defendants claimed that they had properly included the sugar in inventory, because title to it had not yet passed to the purchaser, but had remained with SuCrest. At the very least, defendants argued, "the applicable tax law was ... in such dispute that it [did not] provide a clear and definite statement of the conduct proscribed ... thereby negating the element of willfulness." *Id.* at 96.

This Court affirmed the convictions. The Court noted that another portion of Section 1.471–1 stated that inventories must be an "income-producing factor." And, according to the Court, the facts showed that the sugar "was never intend-

ed" to be "an income-producing factor." To the contrary, the facts revealed that SuCrest had "absolutely no beneficial interest [in the sugar]," and used it solely "to inflate inventory for a few days solely for tax purposes." *Id.* at 95. Relying on the long established principle that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed," *id.*, this Court concluded that the defendants "surely ... knew they were committing a wrongful act." *Id.* at 96.

*Ingredient Technology* is directly analogous to the instant case. Just as the SuCrest defendants had no beneficial interest in their claimed inventory, Pirro had no beneficial interest in half of the 90% of the DPC shares he claimed on his 1992 return. Irrespective of any sham "legal title," Pirro gave Boyle "actual command" over 45% of the DPC shares. If the plain allegations of the indictment can be proven, Pirro surely knew he was committing a wrong when he concealed that fact on his 1992 return.

To sum up, in my view: (1) beneficial owners of an S Corporation's stock are indeed "persons owning shares in the corporation" or "shareholders" for purposes of the reporting requirements of 26 U.S.C. 6037(a); and (2) if Boyle was a beneficial owner of DPC stock, then Pirro violated a known legal duty by failing to report him on the 1992 return.

Again, I recognize that under the heightened standards applicable to tax prosecutions, the question presented by this case is an exceedingly close one. The difficulty of that question, moreover, is greatly exacerbated by the undeveloped state of this record. Perhaps my colleagues would be persuaded if the government offered proof that Boyle stashed secret stock certificates evidencing his 45% beneficial ownership of DPC under his mattress. While the government has understandably not offered such evidence, it does stand willing to prove that Boyle had all the rights and obligations of a beneficial

shareholder (as well as any other necessary indicia). Of course if the government were to fail in its endeavor, the district court could then dismiss the Boyle Allegations at the close of the government's case. *See* Fed.R.Civ.P. 29. In my view, it was simply premature for the district court to do so before trial.